THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW BURKE, Defendant-Appellant.

First District (3rd Division) No. 85—0090

Opinion filed December 16, 1987.—Rehearing denied January 25, 1988.

890

James Doherty, Public Defender, of Chicago (Richard E. Gade, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., and Bonnie Meyer Sloan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Andrew Burke, and Geoffrey Freeman were charged by information in the circuit court of Cook County with several offenses arising from the January 22, 1981, murder and armed robbery of Madeline Mullenix. The causes were severed and defendant and Freeman were tried separately. A jury convicted defendant of murder and armed robbery. Judge Lawrence Genesen sentenced defendant to natural life imprisonment for the murder and 30 years for the armed robbery after Judge Richard Petrarca had sentenced Freeman to natural life imprisonment and then recused himself.

Madeline Mullenix disappeared on January 22, 1981. Her two sons searched for her in the days after the 22nd. One son, Vern Mullenix, spotted her 1978 Ford automobile near 123rd and Halsted Streets in Chicago on January 25. He noted that the Ford had license plates bearing ZT 906. He gave the Calumet Park police this information and they determined that the license plates belonged to Jack Burke, defendant's grandfather. Later on the 25th, Chicago police officer Pa-

trick Murphy went to Jack Burke's home and learned from him that the license plates on the Ford had been taken from his automobile. Officer Murphy also learned that defendant worked at the Secretary of State's facility at 99th Street and King Drive in Chicago. Mrs. Mullenix's sons again spotted the Ford on the 26th in front of 12246 S. Lafayette in Chicago. When Officer Murphy arrived there, he inspected the car and saw that it had a temporary registration permit in the name of Geoffrey Freeman. The police then broke into the car and found several items belonging to Mrs. Mullenix and Geoffrey Freeman's driver's license. Shortly thereafter, the police located and arrested Freeman. Freeman eventually led the police to a spot near 134th and Maryland Streets where Mrs. Mullenix's body was found in some underbrush. While Freeman did so, Officer Murphy went to the Secretary of State's facility to arrest defendant.

After arresting him, Officer Murphy advised defendant of his *Miranda* rights and defendant responded that he understood them. After he was taken to Area 2 headquarters, where Freeman had also been taken, Detective Dennis McGuire advised defendant of his *Miranda* rights and defendant again indicated he understood them and agreed to talk. Detective McGuire then informed defendant of the investigation of Mullenix's murder and that he was a suspect. After defendant denied participating in the crime, McGuire told him that Freeman was in custody. Defendant admitted knowing Freeman but denied having been with him on January 22. He claimed that he was with a friend on that date. McGuire then told defendant that Freeman was claiming that defendant had shot and killed Mrs. Mullenix, that his license plates had been found on her car, and that the friend defendant claimed being with on January 22 denied that he was with her then. Defendant then admitted having been with Freeman and stated that if his handcuffs were removed he would talk.

Defendant told the police that he and Freeman had been out looking for a car for Freeman when they observed the victim's car at a hamburger stand near 127th Street and the "expressway." Freeman, who had a gun, told defendant to stop the car. As he approached the car, Freeman noticed someone watching and stopped at a phone booth as if making a call. The victim then drove off and Freeman returned to defendant's car and told him to follow the victim. As they were following the victim's car, Freeman told defendant to "bump" the victim's car. When defendant did so, Mrs. Mullenix pulled over. Freeman then got out of defendant's car, walked to the driver's side of the victim's car, had a short conversation with her and then shot her. Mrs. Mullenix then blew the car horn and Freeman pushed her over to the

passenger side and got in her car. Freeman then drove the victim's car to the Altgeld Gardens housing project and defendant followed in his car. When they stopped, Freeman took the victim's body out of the car and dumped it. When defendant realized the victim was dead, he fought with Freeman because of her death. Defendant then left to go to his friend's house and at the time had possession of the gun Freeman used to shoot the victim. Defendant hid the weapon in the heating duct of his friend's house.

After defendant made this statement, Detective McGuire contacted the State's Attorney's Felony Review Unit. Assistant State's Attorneys Farrell and Weintroub arrived at Area 2 headquarters in response. Thereafter, Farrell questioned defendant in the presence of Detective Tosello after advising defendant of his *Miranda* rights. Defendant responded that he understood those rights. Defendant then gave Farrell a second statement, which was consistent with the first. Farrell then spoke with Freeman out of defendant's presence and brought them together after each accused the other of shooting the victim. When brought together, defendant and Freeman still maintained the other had shot Mrs. Mullenix. Thereafter, Weintroub spoke to defendant in Detective Mosher's presence after advising defendant of his constitutional rights, which defendant again indicated he understood. After indicating his willingness to speak to Weintroub, defendant responded to questioning for 90 minutes. Thereafter, Weintroub asked defendant if he wanted his statement put in writing and defendant said yes.

Later that evening, Weintroub took another statement from defendant in Farrell's and Mosher's presence, which was transcribed by a court reporter. At this time, defendant was again advised of his *Miranda* rights and defendant responded that he understood them and that he wanted to talk. After the statement was typed, Weintroub gave it to defendant and asked him to read it. Defendant asked Weintroub to read it to him. After he did so, defendant initialled each page, pointed out a mistake in the numbering of the pages, initialled the correction, and signed the statement.

Defendant and Freeman were charged with murder, conspiracy, aggravated kidnapping, burglary, theft, possession of a stolen motor vehicle, armed violence and armed robbery. After the causes were severed, defendant filed a motion to suppress his statements on the grounds that, *inter alia*, he could not knowingly and intelligently waive his *Miranda* rights because of his limited mental capacity.

Defendant adduced the following evidence at the hearing: when he "graduated" from grammar school in 1975, at 15, his grade level was

2 to 2.5; when he finished high school in 1979 his achievement level, including his comprehension, had not improved and he was still functioning at a nine-year old's level; administration of standardized academic achievement tests revealed that defendant had not progressed since high school; defendant's performance on the Wechsler Adult Intelligence Test revealed that he had an I.Q. of 62, placing him in the bottom subfraction of the bottom 1% of the general population; defendant also suffers from developmental aphasia, a "neurodevelopmental" condition affecting the ability to accomplish mental tasks such as the processing of language; defendant also has difficulty learning new terms in an unfamiliar environment and suffers from a "bilateral central nervous system disorder" affecting his sensory perception; another standardized test designed to measure memory, learning, problem solving and abstraction revealed that defendant was impaired in all of those areas, especially in understanding cause and effect, and had a very bad memory; defendant is easily confused and vulnerable to environmental manipulation; despite a very adaptive social facade, defendant has difficulty understanding what is going on; further testing and examination of defendant's school records and family history revealed that his language skills are significantly low and that he may give the impression that he understands more than he actually does.

Additionally, defense counsel hypothetically asked the clinical psychologist who tested defendant whether, based on the facts of defendant's questioning by the police, he could have understood his *Miranda* rights and effectively waived them. He responded that he was not sure whether repetitions of the rights would make any difference, that while defendant would have a reasonable sense of the meaning of each word there was not "one chance in a million" that he would understand the "intent" of all the words, and that he could not waive his rights because he did not understand them. Defendant testified that: he does not want people to know that he has difficulty understanding things; he did not know what an assistant State's Attorney was; when arrested he did not know what an attorney was but had since learned that he defended people; he did not know the meaning of "remain" but knew that "silent" meant "[b]e quiet"; "right" meant to "write a letter" or "you can be right"; he did not know the meaning of "waive" or what a "constitution" was; he did not understand the meaning of "court-appointed attorney" or of "what you say can be used against you in court"; if he had known that he didn't have to say anything on January 26, he would not have; and he had never been arrested before that date.

The trial court denied the motion, finding that, although defendant had a "subnormal mentality," the police had not taken advantage of it. The trial court specifically considered defendant's courtroom demeanor and his written statement in denying the motion.

OPINION

Defendant first contends the trial court erred in failing to suppress his oral and written statements. Specifically, he asserts the State failed to meet its burdens of proving that he was advised of his *Miranda* rights in a manner that, in light of his subnormal intelligence and impaired language abilities, assured he understood those rights and thus that he voluntarily, knowingly and intelligently waived them. He argues that the *pro forma* manner in which he was advised of his rights was meaningless to him and thus rendered him incapable of making an effective waiver of those rights. As such, he concludes, his decision to talk to the police resulted from fears caused by the coercive interrogative atmosphere in which he found himself for the first time in his life. We cannot agree.

■ The State bears a heavy burden of showing that a statement was knowingly, intelligently and voluntarily made and the trial court's determination as to whether this burden was met shall not be disturbed on review unless it is contrary to the manifest weight of the evidence. (*People v. Brownell* (1980), 79 Ill. 2d 508, 516-17, 521, 404 N.E.2d 181.) That inquiry focuses on the totality of the circumstances surrounding the interrogation. In this regard, both the defendant's characteristics and the details of the interrogation must be considered. The defendant's characteristics which must be examined are those bearing upon his ability to make knowledgeable and independent decisions, including his age, intelligence, prior experience with criminal law and emotional stability. Subnormal mental capacity alone does not render a confession involuntary but it is a factor in determining the voluntariness of a confession. *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 132, 476 N.E.2d 1179.

■ ■ Applying these principles here, we cannot conclude the trial court's denial of the motion to suppress was against the manifest weight of the record evidence. Contrary to defendant's contention that the trial court ignored his evidence, the trial court made specific findings that defendant had "great difficulty in reading and writing" and "subnormal mentality." That the court nonetheless found that defendant had made the requisite waiver of his rights does not alone require a conclusion that it ignored defendant's evidence. Moreover, that the trial court may have, as defendant contends, primarily em-

phasized its observations of defendant during his testimony and the content of his written statement, does not mean that it erred in denying his motion to suppress. It has been recognized that the trial court is in a better position than a court of review to evaluate a defendant's ability to understand his rights. (*People v. Ellison* (1984), 126 Ill. App. 3d 985, 992, 466 N.E.2d 1024.) Obviously, this fact encompasses the trial court's observation of the defendant when he chooses to testify and its evaluation of his ability to respond to verbal questioning. (126 Ill. App. 3d at 994.) Secondly, the manner in which a defendant answers questions may also be considered as part of the totality of the circumstances of the interrogation. (*People v. Williams* (1984), 128 Ill. App. 3d 384, 392, 470 N.E.2d 1140.) As such, the trial court could properly consider the content of defendant's written statement.

 Moreover, there is sufficient record evidence to otherwise support the trial court's denial of the motion to suppress. Specifically, we note that on each of the five occasions he was advised of his *Miranda* rights, defendant unequivocally stated that he understood them. This fact alone is not dispositive. (See *People v. Turner* (1973), 56 Ill. 2d 201, 205, 306 N.E.2d 27 (fact that rights were reiterated and that defendant said he understood them is of little consequence unless he had the intelligence to understand the admonition).) However, other evidence also indicated that defendant understood his rights and the consequences of waiving them.

We note that when Officer Murphy placed defendant under arrest for murder and asked him, after advising him of his *Miranda* rights, whether he wanted to talk, defendant responded he did not know what Murphy was talking about and that he did not want to talk about it. We believe it may be reasonably inferred from defendant's evidence that, if his subnormal mental capacity did render him incapable of understanding and thus effectively waiving his constitutional rights, he would have confessed his involvement in the murder at the time he was first arrested. His explicit refusal to do so, however, belies his argument that he confessed later only because he did not understand those rights and because the police and assistant State's Attorneys took advantage of his limited mental abilities.

We also note that, although defendant agreed to talk fairly soon after he was in custody, he initially denied any involvement in the crime or being with Freeman on January 22. Moreover, he claimed that he was with a friend that evening. We do not believe these denials to be consistent with defendant's claims that he did not understand his rights or the consequences of surrendering them and of making the statements he made to the police. To the contrary, we be-

lieve they clearly manifest an appreciation of his situation and an overt attempt to escape culpability for the crime of which he had been told he was under suspicion. It is also telling that defendant agreed to tell the truth only after being told his license plates had been found on the victim's car, that his friend denied being with him on the 22nd and, most importantly, only after being told that Freeman was accusing, and he heard Freeman accuse, him of shooting the victim. It is a reasonable inference from defendant's knowledge of these facts that his willingness to tell the truth was borne of a perception of the hopelessness of his predicament. Moreover, contrary to defendant's contention, it was not coercive or manipulative interrogation for the police and assistant State's Attorneys to inform defendant of these facts and to bring him face-to-face with Freeman. We do not believe that law enforcement personnel must refrain from speaking to a suspect who had indicated his willingness to talk and thus a waiver of his rights, although he initially denies culpability, in the fear that doing so will be subsequently labeled coercive interrogation where the suspect makes statements an attorney would have advised him not to make. Moreover, defendant cites no authority to the effect that it is impermissible to bring two suspects accusing one another of being the principal perpetrator of a crime face-to-face in an effort to learn the truth.

We further find it significant that the police officers and assistant State's Attorneys who advised defendant of his rights and took his statements testified they noticed nothing unusual about him, that defendant's answers to their questions were coherent and responsive, that defendant was calm and seemed to know what he was doing at all times and that defendant understood his *Miranda* rights and the questions they asked of him. In this regard, defendant notes that Assistant State's Attorneys Farrell and Weintroub conceded that he had been somewhat confused and suffered memory lapses as to some of the specific details surrounding the events of January 22. He implicitly argues that these facts support a finding that he did not understand his *Miranda* rights and thus did not properly waive them. We cannot agree. Specifically, we disagree that confusion and lapse of memory with respect to certain discrete and collateral facts surrounding a crime by a defendant who is concededly of subnormal mentality requires the conclusion that he could not understand his constitutional rights.

■ Finally, we reject defendant's contention that the police and assistant State's Attorneys should have attempted to learn whether he knew what a "right" or "waiver" was or whether he was literate.

Such close examination of the foundation of a suspect's assertion that he understands his rights but nevertheless is willing to talk to law enforcement personnel, while perhaps commendable, is not required under the law. See *People v. Ellison* (1984), 126 Ill. App. 3d 985, 992, 466 N.E.2d 1024 (the police are not required, as a prerequisite to accepting a waiver, to conduct a mental examination of the accused to ascertain his ability to comprehend his rights).

In view of the foregoing evidence, and the reasonable inferences therefrom, we cannot say that the trial court's denial of the motion to suppress was against the manifest weight of all the evidence. In this determination, we take note of defendant's inexperience with the criminal law but do not believe, in light of the sufficient evidence of a knowing waiver of his rights, that it requires a contrary conclusion. Nor do we believe that defendant's cited Illinois cases compel such a conclusion.

In *People v. Simmons* (1975), 60 Ill. 2d 173, 326 N.E.2d 383, the court was unable to conclude "that the evidence, evaluated under the proper standards," failed to support a finding that the confession of "a 16-year-old borderline-mentally-retarded boy" was voluntary. However, it remanded the cause for a redetermination by the trial court of that issue under the standard required in the case of such a defendant, *i.e.*, " 'special care in scrutinizing the record.' " (60 Ill. 2d at 176, 181-82.) Defendant here was not a juvenile when arrested and the standard applied in *Simmons* is thus not applicable to him.

In *People v. Redmon* (1984), 127 Ill. App. 3d 342, 468 N.E.2d 1310, the court reversed the finding of voluntariness of the confessions of a 17-year-old borderline mentally deficient defendant chiefly on the basis of his final written statement. The statement explicitly revealed his lack of understanding of his right to consult an attorney and have him present during questioning and his own statement that he had not understood that right earlier. (127 Ill. App. 3d at 345-46, 349-50.) No such evidence exists in this case.

Finally, in *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27, the court concluded the defendant's confessions should have been suppressed because the record failed to show a knowing, intelligent waiver of his *Miranda* rights and because he had asked the polygraph examiner, to whom he first confessed and who knew of his low mentality, if he could have an attorney. Although the court noted that the defendant had been repeatedly advised of his *Miranda* rights, it did not state whether he had nonetheless explicitly agreed to talk to the police as defendant here did. Moreover, the court did not indicate whether it was defendant's low mentality or his request for a lawyer

or both which precluded a finding of waiver of those rights. As such, we cannot agree that *Turner* supports a finding of nonwaiver here.

■■■ Defendant next contends the sentence of natural life imprisonment imposed by the trial court denied him the equal protection of and due process under the laws. Specifically, he notes that under section 5—8—1(a)(1) of the Unified Code of Corrections a court may impose a term of natural life imprisonment and that under sections 5—8—2(a)(1) and 5—5—3.2(b)(2) thereof it may impose an extended-term sentence of 40 to 80 years when it finds that a murder was exceptionally brutal or heinous. (Ill. Rev. Stat. 1981, ch. 38, pars. 1005—8—1(a)(1), 1005—8—2(a)(1), 1005—5—3.2(b)(2).) However, he argues, because there is no statutory requirement that a court consider articulated factors in differentiating an act meriting an extended term from one meriting a natural life term, the judge has unfettered discretion in choosing which punishment to impose. He contends that *People v. Cartalino* (1982), 111 Ill. App. 3d 578, 444 N.E.2d 662, *rev'd on other grounds in People v. Del Percio* (1985), 105 Ill. 2d 372, 475 N.E.2d 528, which has already rejected this argument, does not do so satisfactorily. Specifically, he argues that in concluding that the factors in aggravation and mitigation enumerated in the Unified Code of Corrections provide sufficient guidelines to avoid constitutional infirmity, *Cartalino* did not recognize that, having found a murder to be brutal or heinous, a trial court must then consider the aggravation and mitigation factors in deciding how many years to impose within the extended-term range. If the trial court must consider the same factors in choosing between an extended or natural life term, defendant reasons, the equal protection problem is compounded rather than resolved.

Defendant has waived this issue by failing to raise it below. (*People v. Lucas* (1981), 88 Ill. 2d 245, 430 N.E.2d 1091.) Assuming he had not, we do not believe that his argument requires a conclusion contrary to that reached in *Cartalino*. Defendant's argument is best answered by quoting *Cartalino* at length:

"Section 5—8—1(a)(1) of the Code (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(1)) does not permit the court to impose a sentence of natural life solely on the basis of the seriousness of the offense committed [citation] without regard to a defendant's rehabilitative potential. [Citation.] In determining a proper sentence for any felony, including murder, factors in aggravation and mitigation must be considered [citations] 'as well as any other such factors as the judge shall set forth on the record that are consistent with purposes and principles of sen-

tencing set out in the Code.' (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(b). See Ill. Rev. Stat. 1979, ch. 38, par. 1005—4—1.) Among aggravating factors listed are whether: defendant received compensation for committing the offense; defendant has a history of criminal activity; and the sentence is necessary to deter others from committing the same offense. (Ill. Rev. Stat. 1979, ch. 38. par. 1005—5—3.2(a).) Mitigating factors are set forth in section 5—5—3.1(a). [Citation.]

Cartalino's argument ignores the aggravating and mitigating factors—as distinct from a finding of brutal conduct—which the Code mandates a circuit court to weigh before imposing any sentence, including one for natural life or an extended term. It is the presence or absence of the specified statutory factors which determine the nature of the sentence imposed on a defendant found guilty of a brutal and heinous murder. It cannot be concluded, from the foregoing, that a circuit court has the totally unbridled discretion to sentence a defendant to natural life or to an extended term. We conclude, therefore, that Cartalino has failed to overcome the strong presumption of the statute's constitutionality [citation], even had there been no waiver." *Cartalino*, 111 Ill. App. 3d at 591-92.

■ Next, defendant contends the sentence of natural life imposed on him is unconscionably excessive because the trial court failed to adequately consider his character and rehabilitative potential or the fact that he was less culpable than Geoffrey Freeman, who "masterminded" the crime and murdered the victim. In brief, defendant argues that the trial court's analysis of his culpability *vis-a-vis* that of Freeman "amounted to little more than assumptions based on unjustifiably negative interpretations of the facts which rose to the level of outrageous hyperbole." Defendant also argues that the trial court did not consider several factors in mitigation which were applicable here under section 5—5—3.1 of the Unified Code of Corrections. These factors were: (1) there were substantial grounds tending to excuse or justify defendant's criminal conduct, *i.e.*, his subnormal mentality; (2) his criminal conduct was induced or facilitated by another; (3) he had no history of prior criminal conduct; (4) his criminal conduct was the result of circumstances unlikely to recur; and (5) his character and attitudes indicate that he is unlikely to commit other crimes. Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.1.

The standards we must apply in deciding this issue were articulated in *People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344:

"[T]he standard of review *** in determining whether a sentence is excessive is: Did the trial judge abuse his discretion in imposing that sentence? [Citations.]
***

The Unified Code of Corrections vests a wide discretion in sentencing courts in order tó permit reasoned judgments as to the penalty appropriate to the particular circumstances of each case. [Citation.] *** '[T]he trial court is normally the proper forum in which a suitable sentence is to be determined and the trial judge's decisions in regard to sentencing are entitled to great deference and weight.' [Citation.]"

■ Applying these principles here, we affirm the sentence imposed on defendant. We believe the record evidence and the trial court's statements of its reasons for imposing a natural life sentence on defendant reflect a proper exercise of the wide discretion vested in it to determine an appropriate sentence. In this regard we reject defendant's contention that the court failed to "adequately" take into account his character, rehabilitative potential or his allegedly lesser culpability relative to that of Geoffrey Freeman. The trial court explicitly recognized its duty to consider the possibility of rehabilitation and defendant's relative culpability, although it weighed these factors against the considerations that it should not deprecate the seriousness of the offense and the protection of society. Moreover, where mitigation evidence is before the court, it is presumed that the sentencing judge considered the evidence, absent some indication, other than the sentence imposed, to the contrary. *People v. Danis* (1984), 129 Ill. App. 3d 664, 472 N.E.2d 1194.

■ The trial court also considered but rejected relevant mitigation factors listed in section 5–5–3.1 of the Unified Code of Corrections, albeit not in *haec verba*. These factors were that defendant had never been convicted or arrested before, had a low I.Q., and that his involvement in the murder was induced or coerced by Freeman. However, we do not believe the trial court was required to consider as mitigating factors that defendant's criminal conduct resulted from circumstances unlikely to recur and that his character and attitudes indicated that he is unlikely to commit another crime. Defendant does not cite any specific mitigation evidence supporting such conclusions and we do not believe they were necessary inferences from defendant's subnormal mentality and his lack of prior criminal conduct. The trial court's rejection of the mitigation factors it did consider does not require a finding of abuse of discretion. While a trial court is required to consider a defendant's rehabilitation potential in sentencing him, it

is not required to give greater weight to that consideration than to the seriousness of the offense. *People v. Mack* (1985), 133 Ill. App. 3d 788, 479 N.E.2d 445.

 In view of the trial court's consideration of proper factors in mitigation and aggravation, defendant's arguments amount to a request that we balance the appropriate factors differently and independently conclude that his sentence is excessive. However, it is not our function to do so. *People v. Cox* (1980), 82 Ill. 2d 280, 412 N.E.2d 541.

For all of the foregoing reasons the judgment of conviction entered and sentence imposed by the trial court are affirmed in their entirety.

Affirmed.

McNAMARA, P.J., and WHITE, J., concur.