THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY CALAHAN, Defendant-Appellant.

First District (1st Division)  No. 1—93—1326

Opinion filed April 24, 1995.

---

Rita A. Fry, Public Defender, of Chicago (Kim L. Sorrells, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and James S. Beligratis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BRADEN delivered the opinion of the court:

After a jury trial in the circuit court of Cook County, defendant, Gregory Calahan, was convicted of aggravated criminal sexual assault (720 ILCS 5/12—14(a)(1) (West 1992)) and sentenced to a 16-year term in the Illinois Department of Corrections.

On appeal, defendant contends (1) his sentence was excessive; (2) section 5—4—3 of the Unified Code of Corrections (Code) (730 ILCS 5/5—4—3 (West 1992)) is unconstitutional; and (3) he was improperly certified as a child sexual offender under sections 1 through 10 of the Habitual Child Sex Offender Registration Act (730 ILCS 150/1 *et seq.* (West 1992)).

We affirm.

S.B., the seven-year-old daughter of defendant's girlfriend, testified that she, her twin sisters and their mother would stay overnight at defendant's apartment on occasion. Shortly before her fifth birthday, S.B. was sleeping in defendant's living room when defendant touched her on the stomach. At the time S.B. was wearing a T-shirt, panties and pajamas.

The victim's maternal grandmother testified that in October 1991, the victim and her twin sisters were placed in her home by the Department of Children and Family Services (DCFS) because their mother had neglected them. In December of that year, the victim's aunt took her to Children's Memorial Hospital because she was experiencing discomfort while urinating.

Dr. Amy Middleman testified that on December 21, 1991, she examined S.B. The doctor found that the border of the hymen was irregular and significantly scarred, suggesting some type of trauma. In her opinion, the victim's injuries were consistent with digital penetration of the vagina. The doctor then notified the police and DCFS.

In January 1992, after an assistant State's Attorney interviewed S.B., Officer Frank Folinazzo went to defendant's residence. The officer then brought defendant to police headquarters. After advising defendant of his *Miranda* rights, an assistant State's Attorney interviewed defendant. Defendant stated that while he and S.B.'s mother were sleeping, the victim came into their room and lay down on the mattress next to defendant. He put his arm around her and started rubbing her stomach with one hand. He then inserted the index finger of his right hand into her vagina, up to the second knuckle, moving his finger in and out for less than 10 seconds. He stated that his finger went in "pretty easy." Defendant's oral statement was later reduced to writing which he signed.

Defendant testified that, while he was dating the victim's mother, she, the victim and her two sisters would spend the night at his apartment. He stated that he had a good relationship with the children and on those occasions when they stayed overnight, he would sleep on the living room couch. His girlfriend and her daughters slept in the bedroom. He denied that any of the children ever slept with him and their mother in the living room, although the victim

sometimes got into bed with them on Saturday mornings to watch cartoons. Defendant testified that at no time did the victim ever complain that she was having any kind of pain or discomfort.

He first became aware of the victim's allegations when police came to his house and took him to the police station. He stated that he was not advised of his rights nor was he allowed to make a telephone call. When the assistant State's Attorney arrived, defendant was sleepy, tired and confused. The attorney gave him a document explaining his rights which he read and signed.

She then gave him a handwritten statement which inculpated him in the molestation of the victim. Although the statement was not true, defendant signed it because he was very tired and sleepy and "would have signed anything by that time." He testified that he signed the document at 11:40 p.m., having been awake since 5 a.m. He also testified that he was told he could not go home until he had signed the statement. He denied ever touching the victim inappropriately. Officer Folinazzo and the assistant State's Attorney testified that neither of them told defendant that if he signed the statement he could go home.

Defendant was ultimately convicted of aggravated criminal sexual assault and sentenced to 16 years in the Illinois Department of Corrections.

Initially on appeal, defendant contends that his sentence was excessive because of his lack of criminal background, his rehabilitative potential, the lack of bodily harm suffered by the victim, and the fact that any psychological harm suffered by the victim may only minimally be considered in aggravation "since it should be limited to the degree of harm inherent in any aggravated assault of a child." Citing *People v. Neither* (1992), 230 Ill. App. 3d 546, 595 N.E.2d 124, he argues that this court should evaluate his sentence in light of sentences imposed in similar cases or a class of cases. He states that the Illinois Department of Corrections (IDOC) 1991 Statistical Presentation revealed that in 1991, Class X felonies statewide carried an average prison term of 10 years, much less than the sentence imposed on him. He also cites other 1991 statistics which demonstrate Federal nonviolent, sexual offenses as having an average sentence of 34 months. Finally, he cites State statistics for 1990 which demonstrate that persons convicted of criminal sexual assault were released from prison after serving a median term of 25 months or a mean term of 30 months. He asserts that the minimum term he will serve is eight years, which is more than three times the average State sentence for criminal sexual assault.

In Illinois aggravated criminal sexual assault is a Class X felony which carries a sentencing range of not less than 6 nor more than 30 years. (730 ILCS 5/5—8—1(a)(3) (West 1992).) When a sentence is imposed within statutory limits, it will not be disturbed absent an abuse of discretion (*People v. Gutirrez* (1990), 205 Ill. App. 3d 231, 564 N.E.2d 850), or unless it is manifestly disproportionate to the nature of the offense. (*People v. Cabrera* (1987), 116 Ill. 2d 474, 508 N.E.2d 708.) As the trial court is in the best position to determine the circumstances of the case, to weigh the credibility of the witnesses, and to evaluate the evidence, its determination as to sentencing is entitled to substantial weight and deference. *People v. Burke* (1987), 164 Ill. App. 3d 889, 518 N.E.2d 372.

The trial court, in order to reach a reasoned determination as to the proper sentence to impose, must consider the circumstances of each case and the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. (*People v. Heredia* (1989), 193 Ill. App. 3d 1073, 1083, 550 N.E.2d 1023, 1029.) A trial court is not required to give greater weight to the rehabilitative potential of the defendant than it is to the seriousness of the offense. (*Burke*, 164 Ill. App. 3d at 901-02, 518 N.E.2d at 380.) When mitigation evidence is before the trial court, there is a strong presumption that it considered that evidence absent some contrary indication other than the sentence imposed. *Burke*, 164 Ill. App. 3d at 901, 518 N.E.2d at 380.

■ The record indicates that the trial court heard all the testimony in aggravation and mitigation and had the opportunity to review the presentence investigation report prior to imposing sentence. Further, the evidence establishes that, while acting as a "father-figure" to the four-year-old victim, defendant inserted his finger into her vagina causing significant scarring to the hymen. In light of the serious nature of the crime, we find that defendant's sentence, well within the statutory limits, was not an abuse of discretion.

Moreover, the trial court is not required to use the published IDOC statistics as guidelines in sentencing a defendant, but is instead required to consider the specific factors of each case in reaching a determination. (730 ILCS 5/5—5—3.1(b) (West 1992).) In *People v. Neither* (1992), 230 Ill. App. 3d 546, 595 N.E.2d 124, cited by defendant, the trial court did not base its sentence on the IDOC statistics as defendant suggests but on the factors mandated by the Code (730 ILCS 5/5—5—3.1(b) (West 1992)). *Neither*, 230 Ill. App. 3d at 551-52, 595 N.E.2d at 127.

Defendant next asserts that section 5—4—3 of the Code (730 ILCS 5/5—4—3 (West 1992)), which requires defendants convicted of

sexual offenses to submit blood samples to the Illinois Department of State Police, is unconstitutional. He divides his argument into six subparts arguing the Code's unconstitutionality under (1) the fourth amendment to the United States Constitution and article 1, section 6, of the Illinois Constitution; (2) the due process clauses of both constitutions; (3) the equal protection clauses of both constitutions; and because of (4) the *ex post facto* imposition created by the statute, (5) its punitive nature; and (6) its cruel and unusual effect on a defendant.

■ Section 5—4—3 of the Code establishes a databank consisting of the genetic identity of persons convicted of sexual offenses or institutionalized as sexually dangerous persons. This information is to be maintained by the Illinois Department of State Police and is to be used only by law enforcement officials.

Section 5—4—3(a)(3) requires a blood specimen to be provided by any person "convicted of a sexual offense *** before the effective date of this amendatory Act of 1989 [who] is presently confined as a result of such conviction." (730 ILCS 5/5—4—3(a)(3) (West 1992).) Section 5—4—3(c) provides that "Any person required *** to provide specimens of blood shall be required to provide such samples prior to final discharge, parole, or release ***." 730 ILCS 5/5—4—3(c) (West 1992).

In the recent case of *Doe v. Gainer* (1994), 162 Ill. 2d 15, 642 N.E.2d 114, the supreme court determined that sections 5—4—3(a)(3) and (c) of the Code were constitutional. In that case the plaintiff argued that section 5—4—3(a)(3) of the Code improperly applied the blood-specimen requirement retroactively to him and that section 5—4—3(c) prohibited his release on parole until he surrendered a specimen of blood. He asserted that the two sections of the Code acted together to violate the prohibition of *ex post facto* laws by restricting his ability to earn parole or release, thereby making more onerous the punishment for his crimes committed before the sections' enactment; and that the sections violated principles of due process by threatening his liberty interests in discretionary and mandatory parole.

■ The supreme court concluded that the provisions in the Code are properly construed as a timing device specifying when the blood sample is to be provided by the offender, rather than an enforcement mechanism which could operate to hold an offender beyond his release date, and therefore were constitutionally sound. The court cited *Jones v. Murray* (4th Cir. 1992), 962 F.2d 302, which involved a substantially similar statute in Virginia. The court noted that although the appellant in *Doe* did not argue that the provisions were

unconstitutional for requiring him to provide a blood specimen, such arguments had failed in other jurisdictions "because a prisoner has no right to refuse to provide a sample of blood, [and therefore] the 'blood testing requirement can legally be implemented.' " (*Gainer*, 162 Ill. 2d at 22, 642 N.E.2d at 117, quoting *Murray*, 962 F.2d at 309.) "Thus, *** nothing would prevent the blood sample from being taken prior to his release from prison." *Gainer*, 162 Ill. 2d at 22, 642 N.E.2d at 117.

■ In determining that the Virginia statute did not violate the protection afforded by the fourth amendment to the United States Constitution, the *Murray* court noted that it knew of no requirement for probable cause or other suspicion to enable government officials to conduct a limited search for the purpose of ascertaining and recording the identity of a prisoner who lost at least some of his rights to personal privacy once he was lawfully confined. (*Murray*, 962 F.2d at 306.) The court then compared the taking of blood under the Virginia statute to the process of fingerprinting and stated:

> "[T]he identification of suspects is relevant not only to solving the crime for which the suspect is arrested, but also for maintaining a permanent record to solve other past and future crimes. This becomes readily apparent when we consider the universal approbation of booking procedures that are followed for every suspect arrested for a felony, whether or not the proof of a particular suspect's crime will involve the use of fingerprint identification." (*Murray*, 962 F.2d at 306.)

The court in *Murray* then held that the fourth amendment did not require an additional finding of individualized suspicion before blood could be taken from incarcerated felons for the purpose of identifying them. The court further stated:

> "Against the minor intrusion, therefore, we weigh the government's interest in preserving a permanent identification record of convicted felons for resolving past and future crimes. It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. The individuality of the DNA provides a dramatic new tool for the law enforcement effort to match suspects and criminal conduct. Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a

DNA bank, or left at the scene of a crime within samples of blood, skin, semen, or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the greater precision of DNA sampling and matching methods." (*Murray*, 962 F.2d at 307.)

We agree with the decision in *Murray* and find it determinative of this case.

Defendant contends that even if the fourth amendment can be construed as not protecting him from mandatory blood testing "there is no way to justify bodily intrusion under the Illinois Constitution." Citing *People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147, he asserts that the Illinois Supreme Court has recognized "that defendants have expanded privacy rights under the State constitution." However, we find that defendant has misrepresented the decision in *Tisler* which held that with respect to the warrantless arrest of a narcotics suspect, the protection against unreasonable searches under the Illinois Constitution is measured by the same standards as are used in defining the protection against unreasonable searches contained in the fourth amendment. Further, the court stated:

"The difference in the language of the 1970 [Illinois] Constitution from that found in the 1870 [Illinois] Constitution and the fourth amendment of the Federal Constitution, to which defendant refers, does no more than specifically provide for fourth amendment protection with regard to eavesdropping and invasion of privacy." (*Tisler*, 103 Ill. 2d at 242, 469 N.E.2d at 156.)

Therefore, in light of *Doe, Murray* and *Tisler*, we find that defendant has not met his burden of proving the statute unconstitutional under either the Federal or State constitution.

We further find that defendant's remaining arguments regarding the constitutionality of the statute have already been considered by the supreme court in *Doe* and therefore we need not review them again. Accordingly, we find defendant's argument regarding the unconstitutionality of section 5—4—3 of the Code without merit.

Defendant next contends that because this was his first conviction of any crime, the trial court improperly certified him as an offender under the Child Sex Offender Registration Act, which provides for the registration of one convicted a second or subsequent time of a sexual offense.

However, Public Act 87—1064, effective January 1, 1993, amended the definitions section of the Child Sex Offender Registration Act (730 ILCS 150/2 (West Supp. 1993)) to read as follows:

"(A) 'Child sex offender' includes any person who, after July 1, 1986, is convicted a second or subsequent time for any of the sex offenses or attempts to commit any of the offenses set forth in subsection (B) of this Section or any person who after the effective date of this amendatory Act of 1992 is convicted for any of the sex offenses or attempts to commit any of the offenses set forth in subsection (B) of this Section." (730 ILCS 150/2 (West Supp. 1993).) The record indicates that defendant was convicted on February 11, 1993, and, therefore, was properly certified under the Act.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. As part of our judgment, we grant the State's request and assess defendant $100 as costs for this appeal.

Affirmed.

BUCKLEY and WOLFSON, JJ., concur.