2019 IL App (1st) 172383-U
No. 1-17-2383
Order filed December 16, 2019

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 15 CR 5581 |
| v. | ) | |
| | ) | Honorable Charles P. Burns, |
| VICENTE SALGADO, | ) | Judge presiding. |
| | ) | |
| Defendant-Appellant. | ) | |

_____

PRESIDING JUSTICE GRIFFIN delivered the judgment of the court.
Justices Hyman and Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's sentence for first degree murder where the trial court did not abuse its discretion in imposing a sentence within the statutory range and did not consider a factor inherent in the offense.

¶ 2    Following a jury trial, defendant Vicente Salgado was found guilty of first degree murder (720 ILCS 5/9-1(a)(2) (West 2014)) and sentenced to 34 years' imprisonment. On appeal, he argues his sentence is excessive and the trial court impermissibly considered a factor inherent in the offense in imposing sentence. For the following reasons, we affirm.

¶ 3    The evidence at trial showed that defendant was married to Rupertina Gonzalez for 25 years. The couple separated in January 2015 after Gonzalez stated she wanted a divorce, and defendant moved out of their shared residence. The following month, defendant learned Gonzalez was in a relationship with the victim, Juan Manuel Martinez-Olivares. Defendant learned of their relationship when he went to his shared residence with Gonzalez and found her home with Martinez in the bathroom. He later discovered photographs of Martinez on Gonzalez's cell phone.

¶ 4    On March 7, 2015, Gonzalez and defendant arranged to meet at a Burger King at 3 p.m. Defendant, who had a knife in his pocket, arrived at the restaurant and found Gonzalez there with Martinez. Defendant and Gonzalez spoke for 30 minutes. Following their conversation, Gonzalez and Martinez walked out of the restaurant with defendant following them. Gonzalez feared defendant, who had told her she "was going to regret it." Gonzalez and Martinez both told defendant to let her go, and defendant attacked Martinez, stabbing him and causing him to fall to the ground. While Martinez was on the ground, defendant continued hitting him and stabbed him repeatedly. A man pulled defendant off of Martinez, and defendant fled. He was arrested on a Chicago Transit Authority bus, which he had boarded without a coat and after turning his pants backwards.

¶ 5    The autopsy revealed that Martinez's cause of death was multiple stab and incised wounds. Martinez sustained 24 wounds to his neck, chest, abdomen, head, face, arm, and eyelid, several of which were fatal on their own, including a three-inch deep stab wound to his neck and a stab wound to his left chest, which involved his heart and pericardium. Martinez also sustained an L-shaped stab wound to the right side of his face, meaning that the knife "came out a different path from how it entered the body." The L-shaped wound was the result of either the perpetrator having

"difficulty taking the knife out and twist[ing]" it inside the body as the knife was entering and exiting, or the victim moving.

¶ 6    Defendant testified that on the day in question he left work around 2 p.m. He went to his son's house but did not have a key to get inside one of the doors. To get inside, defendant used a knife to pop the door open. He then put the knife in his pocket and went to meet Gonzalez at Burger King. After speaking with Gonzalez, defendant walked out of the restaurant behind her. He grabbed her hand and asked her to "think things over, that her daughter needed her." Martinez punched defendant's hand, pushed him, and hit him in the chest, but defendant did not sustain any injuries. Martinez told defendant that if he touched Gonzalez again, he was going to "f*** [defendant] up." In response, defendant told Martinez, "[D]on't get involved, this is not your business." He then stabbed Martinez, although he could not recall how many times. Martinez "attack[ed]" him with his hands, but defendant "did not allow" Martinez to injure him. Defendant fled, turned his pants around, and discarded his jacket and the knife.

¶ 7    The jury found defendant guilty of first degree murder. The court denied defendant's motion for a new trial.

¶ 8    At sentencing, the court noted it had reviewed the presentence investigation report (PSI). The PSI showed defendant was 40 years old at the time of the incident and was born in Mexico. He attended elementary school and high school in Mexico and later moved to the U.S. Defendant had been employed at the High Noon Saloon from 2013 until his incarceration. He had two children with Gonzalez. Defendant had no criminal history.

¶ 9    In aggravation, the State argued that defendant failed to take responsibility for his actions and instead blamed Martinez for his own death. Defendant had not "just learned" about Martinez's

relationship with Gonzalez at the time of the offense; rather, defendant had known about their relationship since February 2015. The State emphasized that Martinez told defendant to "let [Gonzalez] go," and defendant retaliated by "brutally stabb[ing] him dozens of times," leaving Martinez's children without a father. Finally, the State asked that the court impose a 40-year sentence, arguing that although defendant did not have a criminal background, the brutality of the murder and defendant's refusal to accept responsibility warranted a sentence above the minimum.

¶ 10    The State presented victim impact statements from the mother of Martinez's children, Veronica Velez; his son, Alexis Martinez; and his daughter, Adriana Martinez. In their statements, Martinez's family members expressed their grief and described the impact that Martinez's death had on their lives.

¶ 11    In mitigation, defense counsel asked for the minimum sentence. Counsel argued defendant had numerous long-term jobs and supported his family. Counsel emphasized defendant's strong family ties and stated that, in court, defendant had been respectful and cooperative. Counsel noted that Martinez's murder was not premeditated, as Gonzalez testified that defendant did not know Martinez would be present at Burger King on the day in question. Instead, defendant "snapped based on the pressure of what was going on in his dissolving marriage." Defendant, however, had "no risk of reoffending" and had no criminal background.

¶ 12    Additionally, counsel mentioned that defendant had been utilizing available resources while incarcerated, including taking General Education Development (GED) and English classes. A guard in jail told defense counsel "how cooperative and what a fabulous inmate [defendant] was and how he really has been working hard at the programs he's in."

¶ 13    Marco Gonzalez, defendant's and Gonzalez's nephew, testified that he had known defendant his entire life. Defendant was a "family man" and was close to his children. Marco worked with defendant at two restaurants, the High Noon Saloon and Taco Fresco, where he was the lead line cook. Defendant was an "exemplary" worker and always on time. Defendant supervised three people as the lead line cook.

¶ 14    Defendant submitted a mitigation report, which detailed defendant's background and mitigating factors warranting the minimum sentence. In preparing the report, the office of the Public Defender interviewed defendant, defendant's brother Pedro Salgado, defendant's son Eduardo Salgado, defendant's daughter-in-law Jasley Salgado, and Marco. Under the background section, the report showed defendant was born in Mexico and raised on a small farm, where he worked from age eight. Defendant was the youngest of 11 children. He finished secondary school in Mexico. Defendant was still close with his family, although they lived in different locations in both the U.S. and Mexico.

¶ 15    Defendant met Gonzalez when he was 16 years old. They dated for eight months and then married. When defendant was 18 years old, the couple had a son, Eduardo. At that time, defendant had been working in an auto parts store. Three years later, defendant learned Gonzalez was having an affair. Eventually, Gonzalez and defendant reconciled. They had a daughter, Joanna Salgado, in 2002.

¶ 16    At some point, defendant and Gonzalez moved to Chicago, where they both had family. They lived with defendant's brother, Pedro. Pedro met Gonzalez for the first time in Chicago but was not impressed with how she treated defendant. Gonzalez called defendant "Indian," a

derogatory term in Mexico that "city people" use to refer to those in rural areas. According to Pedro, Gonzalez continued to belittle defendant throughout the course of their marriage.

¶ 17    Defendant's first priority was his family. In Chicago he often worked multiple jobs so that Gonzalez could stay home to raise their children. When Eduardo was in high school, he and his then-girlfriend, Jasley, had a baby. To ensure they could finish school, defendant reduced his work hours in order to help care for his granddaughter and allowed Jasley to live with them.

¶ 18    The report also set forth various factors in mitigation, including that (1) defendant acted under strong provocation, (2) his conduct was induced by someone else, (3) he had no history of criminal activity and had led a law-abiding life, (4) his conduct was the result of circumstances unlikely to occur, (5) his character and attitude indicate he is unlikely to commit another crime, and (6) his imprisonment would entail excessive hardship on his dependents.

¶ 19    In addition to the mitigation report, defendant submitted seven character reference letters from his family members, friends, and former employer. Virginia Ortiz stated she had known defendant since they were children living in Mexico. Ortiz and defendant both later moved to Chicago. She described defendant as "calm" and "very passive." Defendant was respectful and was not involved in problems, instead dedicating his time to working so he could provide for his family. Gonzalez never had to work because defendant took care of their expenses. Ortiz believed defendant deserved a second chance and would continue to be a good man and father in the future.

¶ 20    Defendant's niece, Susana Salgado Ortiz, wrote that defendant worked hard to provide for his family. She remembered defendant engaging in conversations with her and the other children in their family. He was also dedicated to his children. Susana avoided defendant's house for several years because she noticed that defendant "showed signs of economic and psychological abuse,"

although he always made her feel comfortable and welcome. Susana was a Human Development and Family Life Studies specialist for a nonprofit organization, Centro Romero, in Chicago. She believed defendant could "commit to self-improvement" and would have the Centro Romero organization as a resource when he was released.

¶ 21    In addition to his testimony, Marco also submitted a letter in mitigation. He reiterated that defendant was his uncle and they had worked together. He also described defendant as a "joyful family man" who displayed kindness and compassion. Defendant was a positive influence on Marco due to his work ethic and perseverance. Marco believed defendant would learn from his mistake and come out of incarceration "a better man," who would try to move forward and continue supporting his children.

¶ 22    Defendant's niece, Maria D. Salgado, wrote that defendant played with her when she was a child, despite being tired from working. Defendant was a role model for Maria and others in their family. He had shown "patience and humility" "[e]ven under the current circumstances." Maria described defendant as a hardworking man who provided for his family and elderly parents in Mexico. He traveled almost an hour on public transportation to get to work and two hours to visit his family. Despite working long hours, defendant would make every family event and always offered to help.

¶ 23    Maria further detailed defendant's issues with Gonzalez. Defendant had found Gonzalez cheating on him in their marital residence. Although he moved out of the residence, defendant continued paying rent for Gonzalez and their young daughter to live there. Maria's father gave defendant advice about the marriage, and defendant always listened patiently.

¶ 24    Maria was "shock[ed]" by defendant's crime but believed defendant still displayed good character. She believed the "only explanation" for defendant's actions was that "[i]t was very obvious that [defendant] was being mentally abused by his wife." Their family noticed the abuse but did nothing. Maria could recall Gonzalez calling defendant "dumb" and "tell[ing] him he was not even good at financially maintaining her lifestyle." Defendant worked, cooked, and attended to guests in his household. Maria recalled instances where Gonzalez belittled defendant, and he would apologize to her rather than react aggressively. Maria believed defendant "act[ed] like a different person" on the day of the murder due to "the events in his relationship and all those years of being pushed around by his wife." Nevertheless, Maria still knew defendant was patient, humble, and responsible. He asked Maria's father to send money to his parents rather than having it deposited into his commissary account. Maria's family was willing to support defendant and help him become a productive member of society upon his release.

¶ 25    Defendant's sister-in-law Alicia Salgado Ortiz wrote that she had known defendant since she was five years old. She had never witnessed him involved in issues with others and knew him to be a hard worker and good father. Alicia witnessed Gonzalez belittle defendant and refuse to work. However, defendant "always just smiled and never talked back to her." Defendant was helpful and always had a smile on his face. After serving his sentence, Alicia thought defendant would continue to help everyone.

¶ 26    Pedro, defendant's brother, wrote that defendant was a "family man." He moved to the U.S. for a better life and always worked two jobs "to please" Gonzalez, who stated she was married "to 'be taken care of and not to take care of anyone.' " Gonzalez would make defendant feed their baby in the middle of the night, even after he had worked all day. When Pedro confronted Gonzalez

about forcing defendant to wake up in the middle of the night, she left his apartment. Defendant was patient with Gonzalez and "was always trying to please her," although she treated him as inferior. Pedro and his children did not like visiting defendant's home because Gonzalez treated him poorly. Defendant, however, maintained an optimistic outlook and continued providing for his family and extended family in Mexico. Pedro and the rest of defendant's family supported him. Pedro believed that "years and years of bullying and mental abuse played a major part in how things happened." Defendant had never been violent and "the situation he is in is a result of him being humiliated by his spouse and her lover."

¶ 27    Baris Yuksel, the owner of the High Noon Saloon, submitted a letter describing defendant as a hard worker. Yuksel described defendant as "one of the nicest and friendliest people you can meet in the restaurant business," who never raised his voice or had "so much as an argument with anyone." Yuksel was shocked to hear about the incident as it was out of character for defendant.

¶ 28    In allocution, defendant stated, "I regret for what I did and I'm conscious that I deserve a punishment, but I'm also conscious that I'm being accused of something that I did not start."

¶ 29    The court sentenced defendant to 34 years' imprisonment. In imposing sentence, the court considered defendant's rehabilitative potential, "both statutory and nonstatutory" factors in aggravation and mitigation, the deterrent effect the sentence would have on others, and the need to punish defendant "for taking the life of another individual clearly without justification whatsoever." With respect to mitigating evidence, the court noted defendant's lack of criminal history, good character, employment history, significant familial relationships, and the letters written by various family members and acquaintances. However, the court expressed concern

"about what happened in the trial" and "about how everybody seems to be blaming the victim in this matter."

¶ 30    In considering defendant's rehabilitative potential, the court mentioned that defendant failed to take responsibility for his actions and instead "even today he's indicating that *** it was someone else's responsibility that put him in that situation." The court pointed out that defendant arrived on the scene with a knife. The court went on, "And whatever happened during the conversation, instead of just walking away or even throwing a punch, he pulls out that knife and repeatedly plunges that knife into the victim." The court discussed Martinez's various wounds and that defendant fled the scene and hid the knife. Although the court acknowledged the complications involved in "breakups," it stated, "that does not allow people to take knives out and to *** end the relationship by slicing the individual up as if a chef was slicing up salad fixings for dinner." Ultimately, the court acknowledged that defendant "has a lot of mitigating factors here, but I cannot separate myself *** from the fact that this is in fact a very egregious crime, it's a very violent crime, and it is something that frankly cannot be explained, justified, or condoned."

¶ 31    Defendant filed a motion to reconsider sentence. The court denied the motion, stating, "The sentence is well within the range of sentencing possibilities here. I think it's reasonable and commensurate with the crime the defendant committed and mitigating factors."

¶ 32    On appeal, defendant argues his sentence is excessive in light of the "extreme emotional distress" that accompanied the crime. Because the circumstances that accompanied his crime were unlikely to occur again, he alleges the trial court abused its discretion in sentencing him above the minimum.

¶ 33    When sentencing a defendant, a trial court must consider both "the seriousness of the offense" and "the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Wilson*, 2012 IL App (1st) 101038, ¶ 61. Generally, where a sentence imposed by the trial court is within the statutory limits permitted for the offense, we will not disturb the sentence absent an abuse of discretion by the court. *People v. Burton*, 2015 IL (1st) 131600, ¶ 36. A sentence within the statutory range is not an abuse of discretion unless it is "manifestly disproportionate to the nature of the offense." *People v. Jackson,* 375 Ill. App. 3d 796, 800 (2007).

¶ 34    The trial court, in imposing sentence, considers such factors as "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001). The trial court, having observed the proceedings, is in the best position to weigh the relevant sentencing factors. *People v. Arze*, 2016 IL App (1st) 131959, ¶121. Accordingly, we do not substitute our judgment for that of the trial court merely because we would have balanced the appropriate sentencing factors differently. *People v. Alexander*, 239 Ill. 2d 205, 214 (2010).

¶ 35    In this case, defendant was sentenced to 34 years' imprisonment, well within the statutory range of 20 to 60 years for first degree murder. 730 ILCS 5/5-4.5-20 (West 2016). We therefore presume the sentence was proper absent some indication that the court abused its discretion. *People v. Burton*, 2015 IL (1st) 131600, ¶ 36.

¶ 36    The record shows that the court, in imposing sentence, heard arguments from the parties and considered the PSI, defendant's mitigation report, the character reference letters submitted by his friends and family, his rehabilitative potential, defendant's statement in allocution, and the "statutory and nonstatutory" factors in aggravation and mitigation. The court further considered

the violent nature of the crime, defendant's lack of responsibility, the deterrent effect of the sentence, and the need to punish defendant for the crime. The record, therefore, reflects that the court considered the relevant sentencing factors in imposing sentence. Despite defendant's contention that the court failed to consider his rehabilitative potential, the court explicitly acknowledged it at sentencing and considered the PSI. See *People v. Babiarz*, 271 Ill. App. 3d 153, 164 (1995) ("Where the sentencing court examines a presentence report, it is presumed that the court considered the defendant's potential for rehabilitation."). Because the court considered the relevant sentencing factors, we decline defendant's invitation to reweigh those factors and conclude his sentence is excessive. *People v. Burke*, 164 Ill. App. 3d 889, 902 (1987) (where the trial court properly considered relevant sentencing factors, it is not the function of a reviewing court to rebalance those factors on appeal).

¶ 37 Nevertheless, defendant maintains that the court failed to give adequate weight to the substantial mitigating evidence in this case. Contrary to defendant's assertion, the record flatly rebuts this contention. The court heard and acknowledged the extensive evidence in mitigation prior to imposing sentence. As noted, this included defense counsel's argument in mitigation, a nine-page mitigation report, multiple character reference letters, and testimony from defendant's nephew. The mitigation report detailed defendant's background and various mitigating factors, including the argument that defendant acted under strong provocation and would not likely reoffend. The court noted that it had reviewed defendant's PSI prior to the hearing.

¶ 38 Moreover, although defendant alleges the court failed to consider evidence of Gonzalez's affair, the court spoke about the complications arising from breakups at sentencing, demonstrating that it did consider the "distressing" circumstances defendant was in before imposing sentence.

After acknowledging the significant evidence in mitigation, the court expressed concern with the violent nature of the offense and defendant's refusal to accept responsibility for his actions and found the minimum sentence was not appropriate. See *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12 (while the trial court must consider mitigating factors, the seriousness of the offense is an important factor for the trial court to consider when imposing a sentence). Thus, nothing in the record support's defendant's argument that the court failed to adequately consider mitigating evidence. Defendant merely disagrees with the weight the trial court accorded to the evidence presented. However, the trial court was not required to assign more weight to the mitigating factors than to the circumstances surrounding the offense (*People v. Alexander*, 239 Ill. 2d 205, 214 (2010)), and the presence of mitigating factors did not require that the trial court impose the minimum allowable sentence (*People v. Jones*, 2014, IL App (1st) 120927, ¶ 55). Because defendant has failed to show that the trial court abused its discretion or that his sentence was greatly at variance with the law, we find no basis to disturb his 34-year sentence.

¶ 39    Defendant additionally argues that the court relied on an improper factor inherent in the offense in order to impose a harsher sentence. He claims the court impermissibly relied upon the violence inherent in first degree murder and "clearly placed great weight on Martinez's violent death." The State argues defendant failed to preserve this issue by failing to object and include it in his postsentencing motion. Defendant asks that we review it under the plain error doctrine.

¶ 40    Sentencing issues are forfeited for review unless the defendant both objects to the error at the sentencing hearing and raises the objection in a postsentencing motion. *People v. Powell*, 2012 IL App (1st) 102363, ¶ 7. Nevertheless, forfeited sentencing issues may be reviewed for plain error. *Id.* To obtain relief under the plain error doctrine in the sentencing context, a defendant must

show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *People v. Wooden*, 2014 IL App (1st) 130907, ¶ 10. Before we consider application of the plain error doctrine, we must determine whether any error occurred. *Id.*

¶ 41 We disagree that the court improperly relied on a factor inherent in the offense in sentencing defendant. Although a trial court may not use the existence of an element inherent in the offense as an aggravating factor, it has the discretion to consider the "nature and circumstances" specific to a case, including "the nature and extent of each element of the offense as committed by the defendant." (Internal quotation marks omitted.) *People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986). In this case, the court found defendant's crime particularly "egregious" based on the severity of Martinez's wounds. As previously discussed, one of the relevant sentencing factors is the seriousness of the offense. *Hernandez*, 319 Ill. App. 3d at 529. Further, the trial court need not "ignore factors relevant to the imposition of the sentence." *Saldivar*, 113 Ill. 2d at 268. Because the court did not err in this regard, there was no plain error. *People v. Spicer*, 379 Ill. App. 3d 441, 449 (2007) (without error, there is no plain error). Accordingly, we find defendant's 34-year sentence was not an abuse of discretion, and the trial court did not impermissibly rely on a factor inherent in the offense in imposing such a sentence.

¶ 42 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 43 Affirmed.