2008 VT 53

## State of Vermont v. George Dean Martin

## State of Vermont v. Mark Watkins, Richard Washington, Joey Thibault, Raymond St. Peter, Steven Martin, Michael Lewis, Travis Lamberton, Dennis Barbour and Joseph Williams

[955 A.2d 1144]

Nos. 06-119 & 06-205

Present: Reiber, C.J., Dooley, Johnson and Burgess, JJ., and Devine, D.J., Specially Assigned

Opinion Filed May 2, 2008

*William H. Sorrell*, Attorney General, and *John R. Treadwell*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee (06-119) and Plaintiff-Appellant (06-205).

*Rory Malone*, Prisoners' Rights Office, Montpelier, for Defendant-Appellant (06-119) and Defendants-Appellees (06-205).

¶ 1. **Reiber, C.J.** These consolidated appeals from the Addison and Chittenden District Courts present the question of whether the State may, in keeping with Chapter I, Article 11 of the Vermont Constitution, require convicted nonviolent felons to provide DNA samples for inclusion in state and federal DNA databases under the terms of 20 V.S.A. §§ 1931-1946. We conclude that it may. Accordingly, we affirm the judgment of the Addison District Court and reverse the judgment of the Chittenden District Court.

## I. The Vermont DNA Database and Data Bank

¶ 2. Since 1998, Vermont has required at least some felons to submit a DNA sample for analysis and inclusion in the state and federal DNA databases. See 1997, No. 160 (Adj. Sess.), § 1 (effective April 29, 1998). The purposes of the DNA-sampling statute, as the Legislature announced in 1998, are as follows:

> It is the policy of this state to assist federal, state and local criminal justice and law enforcement agencies in the identification, detection or exclusion of individuals who are subjects of the investigation or prosecution of violent crimes. Identification, detection and exclusion may be facilitated by the DNA analysis of biological evidence left by the perpetrator of a violent crime and recovered from the crime scene. The DNA analysis of biological evidence can also be used to identify missing persons.

20 V.S.A. § 1931. These express purposes remain unchanged.

¶ 3. Under § 1933 of the 1998 statute, only certain offenders were required to submit to DNA sampling: those convicted of certain listed felonies, 20 V.S.A. § 1932(12)(A)-(Q) (2000); those convicted of an attempt to commit a listed felony, *id.* § 1932(12)(R); and those whose plea agreements included a sampling requirement, *id.* § 1932(12)(S). In 2005, the Legislature amended the DNA statute, expanding the list of crimes to include all felonies and attempted felonies. See 2005, No. 83, § 7 (effective June 28, 2005) (codified as amended at 20 V.S.A. § 1932(12)). The amended statute provides that:

(a) The following persons shall submit a DNA sample:

(1) every person convicted in a court in this state of a designated crime on or after the effective date of this subchapter; and

(2) every person who was convicted in a court in this state of a designated crime prior to the effective date of this subchapter and, after the effective date of this subchapter, is:

(A) in the custody of the commissioner of corrections pursuant to 28 V.S.A. § 701;

(B) on parole for a designated crime;

(C) serving a supervised community sentence for a designated crime; and

(D) on probation for a designated crime.

20 V.S.A. § 1933 (Cum. Supp. 2007). At issue in these appeals is the application of the amended statute to nonviolent felons, who would not have been subject to sampling under the 1998 enactment.

¶ 4. A DNA sample is "a tissue sample" and "may be blood or other tissue type specified by the [D]epartment [of Public Safety]." *Id.* § 1932(5). Samples must be taken using the "least intrusive means" that the Department of Public Safety (DPS) determines are scientifically reliable. *Id.* § 1934(a). The DPS regulations currently in force state that "[a]ll DNA samples will consist of a tube of blood unless the DPS develops a less invasive method. That method would then become the method to collect

DNA samples." DNA Database Unit Operating Policy and Procedures § III.A.1, 8 Code of Vermont Rules 28 060 001-3 to -4.

¶ 5. The statute authorizes three uses for the DNA samples. First, the samples may be analyzed "to type the genetic markers . . . for law enforcement identification purposes." *Id.* § 1937(a)(1). The typing tests produce a "DNA record," or "profile," of the sample. *Id.* § 1932(4). It is this profile that serves to uniquely identify the sampled individual. The profile may be stored in either a state DNA database, the federal Combined DNA Index System (CODIS), or other foreign databases. *Id.* §§ 1932(4), 1936.[1] Second, "if personal identifying information is removed, [DNA samples may be used] for protocol development and administrative purposes, including: (A) development of a population database; (B) to support identification protocol development of forensic DNA analysis methods; and (C) for quality control purposes." *Id.* § 1937(a)(2). Finally, DNA samples may be used to identify human remains. *Id.* § 1937(a)(3).

¶ 6. Section 1941 provides that all DNA samples "shall be confidential" and "shall not be used for any purpose other than as provided in [§ 1937]" or to identify missing persons. The statute also provides both criminal and civil penalties for violations of the confidentiality provisions. See *id.* § 1941(c) ("Any person who intentionally violates this section shall be imprisoned not more than one year or fined not more than $10,000.00, or both."); *id.* § 1941(d) ("Any individual aggrieved by a violation of this section may bring an action for civil damages including punitive damages, equitable relief, including restraint of prohibited acts, restitution of wages or other benefits, reinstatement, costs, reasonable attorney's fees and other appropriate relief."). Penalties are also provided for tampering with DNA samples. *Id.* § 1945 ("A person who knowingly or intentionally, without lawful authority, tampers or attempts to tamper with a DNA sample shall be imprisoned not more than three years or fined not more than $10,000.00, or both."). The statute further requires expungement of DNA records and destruction of samples if a person's conviction is reversed on appeal or if a person is granted a full pardon. *Id.* § 1940.

---

[1] We discuss the nature of the information stored in CODIS and the state's database in more detail *infra*, ¶ 26.

## II. Procedural History

¶ 7. These cases comprise the appeals of ten defendants convicted of "designated crimes" between 1999 and 2005. See 20 V.S.A. § 1932(12). Defendant George Dean Martin was convicted in 2004, in the Addison District Court, of two counts of boating while intoxicated, death resulting.[2] The other nine defendants' convictions, all in Chittenden District Court, were for the following offenses: conspiracy to deliver cocaine, escape, larceny, false pretenses, possession of marijuana, violation of conditions of release, possession of heroin, violation of probation, third-offense driving under the influence, aiding in the commission of a felony, and violation of an abuse-prevention order. These offenses are felonies, and all of the defendants here are therefore subject to the sampling requirements in the amended § 1933.[3]

¶ 8. Defendant Martin and the nine Chittenden defendants all refused to provide samples, and the State moved to compel them to provide same. See 20 V.S.A. § 1935(a) ("If a person who is required to provide a DNA sample under this subchapter refuses to provide the sample, the commissioner of the department of corrections or public safety shall file a motion in the district court for an order requiring the person to provide the sample."). The Addison court granted the State's motion, concluding that the sampling statute did not run afoul of either the Fourth Amendment or Article 11. The Chittenden court, by contrast, denied the motion and granted defendants' motions to dismiss, holding that the expansion of the sampling statute to require samples from all felons, though permissible under the Fourth Amendment, violated Article 11. Defendant Martin appeals the Addison court's order, and the State appeals the Chittenden order. See 20 V.S.A. § 1935(g) (providing appeal to this Court as a matter of right from decision on motion to require DNA sample). Both appeals squarely present the question of whether

---

[2] On appeal, this Court reversed one of Martin's convictions. See *State v. Martin*, 2007 VT 96, ¶ 56, 182 Vt. 377, 944 A.2d 867. That reversal has no impact on this opinion.

[3] None of these defendants' crimes would have subjected them to sampling under the pre-2005 version of the statute. See 20 V.S.A. § 1932 (2000). Although we need not reach the question today, this opinion's reasoning would apply with even greater force to violent felons subject to sampling under the prior version of the statute.

Vermont's DNA database statute, as applied to nonviolent felons, violates Chapter I, Article 11 of the Vermont Constitution. We review this question of law de novo.[4]

### III. Article 11

■ ■ ¶ 9. Vermont's Chapter I, Article 11, though "similar in purpose and effect" to the Fourth Amendment to the United States Constitution, *State v. Record*, 150 Vt. 84, 86, 548 A.2d 422, 424 (1988), provides freestanding protection that in many circumstances exceeds the protection available from its federal counterpart. See, e.g., *State v. Berard*, 154 Vt. 306, 310-11, 576 A.2d 118, 120-21 (1990). Like the Fourth Amendment, "Article 11 does not contemplate an absolute prohibition on warrantless searches or seizures, but circumstances under which warrantless searches or seizures are permitted must be jealously and carefully drawn." *State v. Welch*, 160 Vt. 70, 78-79, 624 A.2d 1105, 1110 (1992). We do not lightly depart from the warrant and probable-cause requirements, as we noted in *Berard*:

> ■ Whatever the evolving federal standard, when interpreting Article Eleven, this Court will abandon the warrant and probable-cause requirements, which constitute the standard of reasonableness for a government search that the Framers established, only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.

154 Vt. at 310-11, 576 A.2d at 120-21 (quotations and citations omitted). Requiring the State to demonstrate that it has special needs for a warrantless, suspicionless search or seizure "focuses attention on the nature and extent of those needs and allows the courts, as the traditional protectors of Fourth Amendment rights, to pursue the necessary balancing test in a manner calculated to interfere least with preservation of those rights." *Id.* at 311, 576

---

[4] The State contends that the hearing authorized by 20 V.S.A. § 1935(b) is limited solely to the "issues described in [§ 1935(c)]" and accordingly may not include the constitutional challenges raised here. We rejected this contention in *State v. Wigg*, explicitly stating that "a defendant may challenge the constitutionality of the sampling statute itself at the sampling hearing." 2007 VT 48, ¶ 5 n.3, 181 Vt. 639, 928 A.2d 494 (mem.).

A.2d at 121.[5] Once we determine that a special need exists, we balance the need served against the privacy intrusion at stake. *Id.* at 313, 576 A.2d at 122. This is at root a balancing between the constitutional imperatives announced in Article 11 and Article 1. Cf. *Record*, 150 Vt. at 87, 548 A.2d at 424 ("We recognize that in order to preserve Article One interests the government may properly exercise its inherent power to limit in a very minor way the mobility of some of its citizens." (quotations omitted)).[6] As a backdrop to our analysis of the DNA sampling statute, we recount the development of our special-needs jurisprudence.

¶ 10. We begin with a case, *State v. Record*, that predates our adoption of the special-needs exception, but which is nonetheless instructive for the case at bar. 150 Vt. 84, 548 A.2d 422. In

---

[5] Of the many courts that have reviewed DNA-database statutes, some have used a general balancing (or totality of the circumstances) analysis, while others have engaged in a special-needs analysis. The general-balancing cases include: *United States v. Weikert*, 504 F.3d 1, 5 (1st Cir. 2007); *United States v. Kraklio*, 451 F.3d 922, 924 (8th Cir. 2006); *Johnson v. Quander*, 440 F.3d 489, 494 n.1 (D.C. Cir. 2006); *United States v. Sczubelek*, 402 F.3d 175, 184 (3d Cir. 2005); *Padgett v. Donald*, 401 F.3d 1273, 1278 n.4 (11th Cir. 2005); *United States v. Kincade*, 379 F.3d 813, 831 (9th Cir. 2004); *Groceman v. United States Dep't of Justice*, 354 F.3d 411, 413 (5th Cir. 2004) (per curiam); *Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir. 1996); *Jones v. Murray*, 962 F.2d 302, 307 (4th Cir. 1992); *In re Maricopa County Juvenile Action*, 930 P.2d 496, 501 (Ariz. Ct. App. 1996); *Polston v. State*, 201 S.W.3d 406, 409 (Ark. 2005); *People v. King*, 99 Cal. Rptr. 2d 220, 228 (Ct. App. 2000); *L.S. v. State*, 805 So. 2d 1004, 1007 (Fla. Dist. Ct. App. 2001); *People v. Calahan*, 649 N.E.2d 588, 592 (Ill. App. Ct. 1995); Landry v. Att'y Gen., 709 N.E.2d 1085, 1092 (Mass. 1999); *Cooper v. Gammon*, 943 S.W.2d 699, 704 (Mo. Ct. App. 1997); *Gaines v. State*, 998 P.2d 166, 172 (Nev. 2000); *State ex rel. Juvenile Dep't v. Orozco*, 878 P.2d 432, 435-36 (Or. Ct. App. 1994); *State v. Scarborough*, 201 S.W.3d 607, 616-17 (Tenn. 2006); *Johnson v. Commonwealth*, 529 S.E.2d 769, 779 (Va. 2000); *Doles v. State*, 994 P.2d 315, 319 (Wyo. 1999).

The special-needs cases include: *United States v. Amerson*, 483 F.3d 73, 78 (2d Cir. 2007); *Nicholas v. Goord*, 430 F.3d 652, 667 (2d Cir. 2005), *cert. denied*, 549 U.S. 953, 127 S. Ct. 384 (2006); *Green v. Berge*, 354 F.3d 675, 679 (7th Cir. 2004); *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir. 2003); *Roe v. Marcotte*, 193 F.3d 72, 78 (2d Cir. 1999); *State v. Martinez*, 78 P.3d 769, 774 (Kan. 2003); *State v. O'Hagen*, 914 A.2d 267, 277 (N.J. 2007); *State v. Steele*, 802 N.E.2d 1127, 1137 (Ohio Ct. App. 2003); *Dial v. Vaughan*, 733 A.2d 1, 6-7 (Pa. Commw. Ct. 1999); *In re D.L.C.*, 124 S.W.3d 354, 373 (Tex. App. 2003); *State v. Olivas*, 856 P.2d 1076, 1086 (Wash. 1993).

[6] Article 1 provides that all persons have the right to "certain natural, inherent, and unalienable rights, amongst which are the enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining happiness and safety." Vt. Const. ch. I, art 1.

*Record*, we upheld a program of random roadside sobriety checkpoints against an Article 11 challenge. We noted that "[t]he primary evil sought to be avoided by Article Eleven was the issuance and enforcement of general warrants." *Id.* at 85, 548 A.2d at 423 (citing *Lincoln v. Smith*, 27 Vt. 328, 346 (1855)).[7] The framers abhorred the general warrant because they did not believe that "it should be left to the officer to judge of the ground of suspicion; but that this belonged to the magistrate." *Lincoln*, 27 Vt. at 350. We held in *Record*, however, that the seizures at the sobriety checkpoint were justified because they "enabled the police to apprehend intoxicated drivers who may have otherwise posed a serious threat to society." 150 Vt. at 86, 548 A.2d at 424. Further, the evil sought to be prevented by Article 11's bar on general warrants — to wit, unchecked discretion in agents of the state to search, seize, or arrest — was minimized because "the written police guidelines prevented arbitrary police conduct, and the scope of the roadblock was narrowly drawn." *Id.*

¶ 11. Our special-needs jurisprudence began as such with *State v. Berard*, 154 Vt. 306, 576 A.2d 118, in which we upheld random, suspicionless searches of prison cells. In *Berard*, we adopted the special-needs test suggested by Justice Blackmun's dissent in *O'Connor v. Ortega*, 480 U.S. 709, 741, 744 n.8 (1987). We concluded in *Berard* that "court[s] should invoke a balancing test as the measure of [Article 11] values only when the warrant and probable cause requirements do not present a practical alternative." 154 Vt. at 311, 576 A.2d at 121. " 'Through the balancing test, [courts] then try to identify a standard of reasonableness, other than the traditional one, suitable for the circumstances. The warrant and probable-cause requirements, however, continue to serve as a model in the formulation of the new standard.' " *Id.* (quoting *O'Connor*, 480 U.S. at 744 n.8 (Blackmun,

---

[7] "The most common meaning of 'general warrant' was a warrant that lacked specificity as to whom to arrest or where to search; for example, a warrant directing . . . a search of 'suspicious places.' " T. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 558 n.12 (1999). As do many other aspects of our Constitution, Vermont's Article 11 mirrors a provision of the Pennsylvania Constitution, adopted a year earlier. See *id.* at 683 ("Like the other state [constitutional] provisions adopted in 1776, the Pennsylvania provision focused precisely on the right not to have one's person or house subjected to general warrant authority. That was also true of the 1777 Vermont provision, which copied Pennsylvania's.").

34

J., dissenting)). We concluded that the State had met its burden, in *Berard*, of showing "that the prison environment presents special needs which 'make the warrant and probable-cause requirement impracticable.'" *Id.* at 312, 576 A.2d at 121 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring in the judgment)). We based this conclusion on "the inexorable nature of prison governance in general," on a trial court finding that "[p]ossession of contraband by inmates is an ongoing concern among correctional officials," and on the fact that prisons would be hard-pressed to fulfill their statutory duty to "maintain security, safety and order at the correctional facilities" without "an effective procedure for detecting contraband." *Id.* at 312-13, 576 A.2d at 121-22 (quotations omitted). We further noted that prisoners' "expectation of privacy [is] considerably diminished at best." *Id.* at 311, 576 A.2d at 121.

¶ 12. In our next special-needs case, *State v. Richardson*, we upheld the warrantless seizure of a gun from an about-to-be-impounded automobile at a DUI stop. 158 Vt. 635, 635, 603 A.2d 378, 378 (1992) (mem.). Although *Richardson*, a brief entry order, contains no prolonged analysis, its rationale was that the seizure was justified by " 'concern for the safety of the general public who might be endangered if an intruder removed [the gun].' " *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973)). As we noted in *Richardson*, the seizure was made without benefit of the "established departmental procedures" that governed the officers in *Cady*, but the lack of such procedures was of no moment in light of the "obvious prudence" of the *Richardson* officers and the "unacceptable danger to the public at large." *Id.* at 635-36, 603 A.2d at 379.

¶ 13. The following year, in *State v. Lockwood*, we considered the validity of a probation condition requiring a developmentally disabled sex offender to submit to " 'body, clothing, [and] residential search as required.'" 160 Vt. 547, 549, 632 A.2d 655, 658 (1993) (alteration in original). We concluded that "the special needs of the state in administering its probation program create[] an exception to the warrant requirement and permit[] a degree of 'impingement upon privacy that would not be constitutional if applied to the public at large.'" *Id.* at 559, 632 A.2d at 663 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 875 (1987)). Our narrow holding in *Lockwood* — that when "officers have reasonable grounds . . . to conduct a search under the authority of a

condition of probation, Article 11 does not require a search warrant" — was explicitly premised on the probation system's public-protection goals and the diminished privacy rights of probationers. *Id.* at 559-60, 632 A.2d at 663. Although our special-needs cases are limited in number, their principles guide our analysis here.

## A. The DNA-Database Statute is Subject to Article 11

¶ 14. As a threshold matter, we agree with the many courts that have held that DNA sampling, by blood draw or by cheek swab, is subject to constitutional protections. See, e.g., *Amerson*, 483 F.3d at 77 ("It is settled law that DNA indexing statutes, because they authorize both a physical intrusion to obtain a tissue sample and a chemical analysis to obtain private physiological information about a person, are subject to the strictures of the Fourth Amendment."); *United States v. Nicolosi*, 885 F. Supp. 50, 55-56 (E.D.N.Y. 1995) (cheek swab is physically intrusive to a degree sufficient to trigger Fourth Amendment protection); *Landry*, 709 N.E.2d at 1090 (DNA sampling subject to state constitutional protections). The initial taking of the DNA sample, either by blood draw or by buccal swab, and the subsequent analysis, storage, and searching of the DNA profile are independent intrusions upon personal security that merit scrutiny under Article 11.

## B. The Existence of a "Special Need"

¶ 15. The State contends that the DNA statute serves several special needs: "(1) deterrence of all criminal conduct, (2) accurate identification of perpetrators, (3) exclusion of innocent suspects, and (4) assistance in the identification of missing persons." Defendants argue that the primary purpose of the sampling statute is articulated in the first sentence of 20 V.S.A. § 1931, which states: "It is the policy of this state to assist federal, state and local criminal justice and law enforcement agencies in the identification, detection or exclusion of individuals who are subjects of the investigation or prosecution of violent crimes." Accordingly, defendants contend that the primary purpose of the statute is normal law enforcement, and that the probable-cause and warrant requirements therefore apply. We conclude that the statute does serve special needs beyond normal law enforcement.

■ ¶ 16. We agree, as an initial matter, with the Supreme Court of New Jersey's conclusion that DNA database statutes like ours fill special needs in part because, "[a]lthough the enumerated purposes may involve law enforcement to some degree, the central purposes of the DNA testing are not intended to subject the donor to criminal charges." *O'Hagen*, 914 A.2d at 278. The New Jersey court went on to clarify:

> Here, the primary purposes of the DNA tests are to create a DNA database and to assist in the identification of persons at a crime scene should the investigation of such crimes permit resort to DNA testing of evidence. That is a long-range special need that does not have the *immediate* objective of gathering evidence against the offender.

*Id.* at 279 (citation omitted and emphasis added).

■ ¶ 17. This distinction was based on three U.S. Supreme Court special-needs cases that mark the boundaries of the Fourth Amendment special-needs doctrine. The cases are: *Illinois v. Lidster*, 540 U.S. 419, 427-28 (2004) (upholding brief seizure of motorists at roadblock seeking information about hit-and-run accident already known to have occurred); *Ferguson v. City of Charleston*, 532 U.S. 67, 84 (2001) (drug-testing program for pregnant women did not serve special needs; primary purpose was to use the threat of criminal prosecution based on the test results to "force women into treatment"); and *City of Indianapolis v. Edmond*, 531 U.S. 32, 44 (2000) (police checkpoint for "crime control" does not serve a special need; Court "cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime"). "Under these cases," the *O'Hagen* court concluded, "suspicionless searches are unconstitutional if the immediate purpose is to gather evidence against the individual for general crime control purposes. On the other hand, if the core objective of the police conduct serves a special need other than immediate crime detection, the search may be constitutional." 914 A.2d at 279.

■ ■ ¶ 18. Of similar import on this point are the Second Circuit cases considering the federal, New York, and Connecticut DNA database statutes. See *United States v. Amerson*, 483 F.3d

73 (2d Cir. 2007) (federal statute); *Nicholas v. Goord,* 430 F.3d 652 (2d Cir. 2005) (New York statute), *cert. denied,* 549 U.S. 953, 127 S. Ct. 384 (2006); *Roe v. Marcotte,* 193 F.3d 72 (2d Cir. 1999) (Connecticut statute). The Second Circuit's analysis of *Edmond, Ferguson,* and *Lidster* closely parallels the *O'Hagen* court's. See *Amerson,* 483 F.3d at 80-81; *Goord,* 430 F.3d at 663. *Lidster,* as the *Goord* court wrote, requires

> a more nuanced approach to law-enforcement con-cerns. . . . *Lidster* instructs courts to examine carefully the *type* of law-enforcement concern served by a particu-lar search or seizure regime. . . . [W]e find it crucial that the state, in collecting DNA samples, is not trying to determine that a particular individual has engaged in some specific wrongdoing. Although the DNA samples may eventually help law enforcement identify the perpe-trator of a crime, at the time of collection, the samples in fact provide no evidence in and of themselves of criminal wrongdoing, and are not sought for the investigation of a specific crime.

*Goord,* 430 F.3d at 668-69 (quotations and citation omitted). As noted above, the principal evil sought to be remedied by Article 11 and its federal and state counterparts was the issuance of general warrants and the concomitant vesting of officers of the state with unlimited discretion to intrude upon the privacy inter-ests of *particular* individuals of their choice without particularized suspicion, in the hope of immediately discovering wrongdoing.

¶ 19. We conclude that the *O'Hagen* reasoning also applies under Article 11, and that DNA sampling and analysis to assist in identifying persons at future crime scenes is a special need beyond normal law enforcement. Vermont's DNA database statute has as its stated purpose "to assist federal, state and local criminal justice and law enforcement agencies in the identification, detection or exclusion of individuals who are subjects of the investigation or prosecution of violent crimes." 20 V.S.A. § 1931. These purposes are distinct from the normal law-enforcement activities of investigating particular people for crimes already committed.

¶ 20. Although the structure of § 1931 makes clear that identifying missing persons is not the primary purpose of the

statute, its presence highlights that the statute is not, as a general matter, concerned with "ordinary law enforcement." Rather the statute seeks to use DNA to accurately and efficiently identify persons in a variety of contexts, including subsequent criminal prosecutions.[8] These goals are beyond the normal goals of law enforcement. We note, finally, that the statute also serves another special need beyond those stated in § 1931: deterrence. Although the question of whether — and to what extent — a particular penological strategy will deter crime is fraught with uncertainty, we think it plain that at least some deterrent effect will accrue if felons know that their DNA has been sampled and indexed and might someday be detected at a crime scene if they reoffend.

## C. Special-Needs Balancing Test

¶ 21. Having concluded that the DNA statute serves special needs beyond normal law enforcement, we turn to a balancing of the competing public and private interests at stake. See *Berard*, 154 Vt. at 317, 576 A.2d at 124 (balancing the state's need for effective prison-cell searches against inmates' right to be free from "unreasonably invasive or arbitrary treatment"); *O'Hagen*, 914 A.2d at 279-81. The State asserts that the public's interests in the DNA database and data bank are: "(1) deterrence of all criminal conduct, (2) accurate identification of perpetrators, (3) exclusion of innocent suspects, and (4) assistance in the identification of missing persons." Defendants characterize the State's interest as "general law enforcement" and assert that it is outweighed by sampled individuals' interest in keeping private the "personal genetic traits" revealed by DNA analysis. There are two intrusions at issue: (1) the initial sampling by buccal swab, and (2) the subsequent analysis, indexing, and searching of the information obtained.

¶ 22. We first consider the privacy interests involved in the initial sampling. As noted, the record does not conclusively establish which collection method will be employed. The statute does mandate, however, that the least intrusive available means be used, and the State has averred, without opposition, that the

---

[8] As was noted at oral argument, felons commonly use aliases and false identities, and accurate identification of those who employ such gambits will be furthered by the DNA database.

samples will be taken by cheek swab. Further, although the record in these appeals is not altogether clear, at the time of our decision in *In re R.H.*, the DPS was using cheek swabs to obtain DNA samples. 171 Vt. 227, 238, 762 A.2d 1239, 1247 (2000). As the statute requires the least-intrusive scientifically valid means of collection, it is safe to suppose that cheek swabs remain as viable today as they were at the time of *R.H.* Accordingly, our analysis assumes the DPS will use cheek swabs to obtain DNA.

¶ 23. In *R.H.*, we upheld the use of a nontestimonial identification order (NTO) based on less than probable cause to compel a suspect to submit to DNA sampling by cheek swab. We concluded that taking a DNA sample by that method was less intrusive than taking a blood sample, see *Schmerber v. California*, 384 U.S. 757, 769-70 (1966), or a pubic hair sample, see *State v. Towne*, 158 Vt. 607, 621, 615 A.2d 484, 492 (1992), and could therefore be justified by reasonable suspicion rather than probable cause in the NTO context. *In re R.H.*, 171 Vt. at 234, 762 A.2d at 1244. The suspect in *R.H.* was neither incarcerated nor under any other form of supervision by the state at the time of the order; accordingly, his expectations of privacy were undiminished. *R.H.* also highlights the different protections applicable when DNA sampling is conducted to investigate a particular crime and potentially subject the sampled individual to immediate criminal charges. Although *R.H.* does not answer the question before us, we find no reason to depart from our unanimous statement in *R.H.* that the initial sampling is minimally intrusive. Accord *O'Hagen*, 914 A.2d at 280 ("[A buccal swab] is no more intrusive than the fingerprint procedure and the taking of one's photograph that a person must already undergo as part of the normal arrest process."). We have also held, in *Lockwood*, that probationers are subject to "'impingement[s] upon privacy that would not be constitutional if applied to the public at large.'" 160 Vt. at 559, 632 A.2d at 663 (quoting *Griffin*, 483 U.S. at 875). The initial sampling, taken alone, does not violate Article 11.

¶ 24. Defendants contend, however, that the principal intrusion into interests protected by Article 11 occurs after the initial sampling, when the sample is analyzed to yield a profile, and the profile is included in the database. See 20 V.S.A. §§ 1936-1939. Citing *Goord*, 430 F.3d at 670, defendants' principal argument is that "[t]he analysis of an individual's DNA reveals personal genetic traits that many people choose to keep private" and that

such analysis is a "far greater intrusion" into protected privacy interests than the initial sampling. The Chittenden District Court agreed:

> Analysis of DNA is an intrusion into personal information which many people choose to keep private. It is unique to the individual, and contains information concerning the person's medical conditions and frailties, paternity and other familia[l] relationships. DNA analysis not only identifies an individual, but also members of his or her family. Under Article 11, Vermonters have a reasonable expectation of privacy in their DNA. If this were not the case, an NTO based on reasonable suspicion would not be required before a DNA sample could be taken.

¶ 25. A few opinions lend support to defendants' argument, envisioning an inexorable march from DNA databases like Vermont's to a dystopian future of eugenics, gene-based discrimination, and other horribles worthy of Aldous Huxley.[9] See, e.g., Kincade, 379 F.3d at 847, 851 (Reinhardt, J., dissenting) (asserting that "in the hands of an administration that chooses to exalt order at the cost of liberty, the database could be used to repress dissent or, quite literally, to eliminate political opposition" and that "we all have reason to fear that the nightmarish worlds depicted in films such as Minority Report [in which genetically altered 'precognitives' are able to see into the future] and Gattaca [in which the protagonist purchases a superior genetic identity in order to be chosen for a mission to Saturn] will become realities" (quotation and citation omitted)). Similarly, a federal district court judge in Massachusetts recently concluded that the federal DNA database statute was unconstitutional as applied to a probationer because "all information collected will one day be exploited." United States v. Stewart, 468 F. Supp. 2d 261, 280 (D. Mass. 2007) (Young, J.). Suffice it to say that these fears — which are echoed in defendants' briefs — find little foundation in the statute before

---

[9] We do not "scoff," post, ¶ 68, at the notion that the statute presages authoritarian futures. Rather, consistent with our constitutionally limited role, we simply do not speculate about what the statute "presages" at all. Instead we consider, based on the record before us, what the statute actually authorizes the State to do.

us today, which does not authorize or make possible such encroachments.[10]

¶ 26. Rather, what the statute authorizes is the creation, storage, and searching of a unique alphanumeric identifier based on analysis of thirteen locations on DNA that are not associated with any known physical trait. This identifier is the only information contained in each person's database profile, see 20 V.S.A. § 1932(4), and reveals no information about "personal genetic traits that many people choose to keep private," as appellants contend. See, e.g., *Goord*, 430 F.3d at 670 ("The junk DNA that is extracted has, at present, no known function, except to accurately and uniquely establish identity. Although science may someday be able to unearth much more information about us through our junk DNA, that capability does not yet exist, and, more importantly, the New York statute prohibits such analysis."); see also, e.g., J. Grand, Note, *The Blooding of America: Privacy and the DNA Dragnet*, 23 Cardozo L. Rev. 2277, 2320 (2002) ("By limiting the amount of genetic information included in a profile, the CODIS database is practical for identification purposes only."); D. Kaye, *Two Fallacies About DNA Data Banks for Law Enforcement*, 67 Brook. L. Rev. 179, 188 (2001) ("The thirteen

---

[10] Our dissenting colleague is similarly concerned with the "significant privacy interests involved," *post*, ¶ 58, in the State's purported gathering of a "panoply of private genetic information, including physical and medical characteristics, genealogy, and predisposition to disease" revealed by DNA, *post*, ¶ 59. But this information, to the extent it *could be* extracted from a DNA sample, is explicitly not gathered under the statute we analyze today. See *supra*, ¶ 6 and the statutory provisions cited therein. Cases like this one "must be decided on the facts of each case, not by . . . generalizations." *Dow Chem. Co. v. United States*, 476 U.S. 227, 238 n.5 (1986). We analyze the search that is actually authorized by the statute and before us in this case. The dissent, in large part, analyzes a search that *might* occur if a malicious someone with access to unspecified DNA-analysis technology violated the plain terms of the statute. But a *potential* search, particularly one that is explicitly prohibited by statute, cannot be the subject of a case or controversy ripe for decision by this Court, and so a fortiori cannot violate Article 11. Cf. *United States v. Karo*, 468 U.S. 705, 712 (1984) ("[W]e have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of the Fourth Amendment."). The dissent would effectively have us issue an advisory opinion about the constitutionality of events that simply have not happened. This we cannot do. See *In re Constitutionality of House Bill 88*, 115 Vt. 524, 529, 64 A.2d 169, 172 (1949) ("By no possible construction of the Constitution of this State can [the judicial] power be enlarged to include the giving of an opinion upon a question of law not involved in actual and bona fide litigation brought before the Court in the course of appropriate procedure.").

standard identifying loci used in [CODIS] . . . are noncoding, and none is known to correlate with any observable traits — stigmatizing or otherwise.").

¶ 27. Like the New York statute at issue in *Goord*, the statute we consider today expressly prohibits analysis of DNA samples for any but three narrow purposes: creating a profile for inclusion in CODIS and the state database, 20 V.S.A. § 1932(4); administrative purposes and protocol development, if all individual identifying information is removed from the sample, *id.* § 1937(a)(2); and identifying human remains, *id.* § 1937(a)(3). The intrusions occasioned by these uses are minimal and, like searching a fingerprint database, reveal nothing more than mere identity.[11] The dissent also relies on an article, D. Concar, *What's in a Fingerprint*, New Scientist, May 5, 2001, at 9, which is not part of the record on appeal, see V.R.A.P. 10, and which is plainly not material a court might properly take judicial notice of. See Reporter's Notes, V.R.E. 201, and cases cited therein. As a general matter, facts may be noticed when they are either generally known or "capable of accurate and ready determination

---

[11] The dissent concedes that "convicted criminals make their identity a public concern by committing a crime, and the government must have identifying information to administer the criminal justice system," but contends that the "extraction, analysis, indefinite storage and repeated law enforcement searches" of the DNA samples "seriously undercut[] the constitutional right of citizens to be free in their persons." *Post*, ¶ 60. The dissent elides the fact that the feared "analysis" simply results in a numeric identifier that, on the record before us, reveals nothing other than the identity of the person from whom a particular sample was taken. The primary authority cited for the proposition that more information *might* be extracted is a student note that cites no other authority. See *post*, ¶ 62 (citing P. Monteleoni, Note, *DNA Databases, Universality, and the Fourth Amendment*, 82 N.Y.U. L. Rev. 247, 256 (2007)). The dissent cites the note for the proposition that DNA profiling "can reveal probabilistic information about one's ethnicity and gender," *post*, ¶ 62, but omits to mention the footnote following the quoted language, in which the author concedes that "[i]t is unlikely that analysis of DNA profiles will ever reveal a great deal of information, however, considering that a profile represents such a small percentage of a person's genetic code." Monteleoni, *supra*, at 256 n.51. Further, even if taken as true, the note states only that the DNA could reveal "probabilistic information about . . . ethnicity and gender." *Id.* at 256. Surely the State already knows both the gender and ethnicity of convicted felons based on more than "probabilistic information." In any event, if the State's mere knowledge of a citizen's ethnicity and gender triggered the warrant requirement, every request for, for example, a driver's license would require a warrant, lest the State inadvertently — and, according to the dissent, unconstitutionally — become aware of a driver's gender or ethnicity.

by resort to sources whose accuracy cannot reasonably be questioned." V.R.E. 201(b); accord Advisory Committee Notes, F.R.E. 201(a) (noting that "[a] high degree of indisputability is the essential prerequisite" for taking judicial notice of adjudicative facts); 21B C. Wright & K. Graham, Federal Practice & Procedure § 5106, at 204 n.27 (2d ed. 2005) ("[T]he direct proof of . . . scientific publications by qualified experts would be highly preferable to the rather chancy procedure by which a court may take judicial notice of things about which it could easily be mistaken." (quotation and citation omitted)). It would exceed our authority, and our expertise, to determine that this single article — or any other article we might unilaterally select — conveys the truth about the DNA sampling at issue here.

¶ 28. Wrongful disclosures of DNA-based information are arguably more likely than discriminatory misuse, but that prospect also does not render the DNA-database statute unreasonable under Article 11. The arguments from potential disclosure fail because we presume that the Department of Corrections will comply with the limitations in the regulation. See *Judicial Watch, Inc. v. United States Dep't of Health & Human Servs.*, 27 F. Supp. 2d 240, 243 (D.D.C. 1998) ("The Court must presume . . . that the Executive Branch is aware of its duty . . . to faithfully execute the law as enacted . . . ."); *City of Marina v. Bd. of Trustees*, 138 P.3d 692, 708 (Cal. 2006) ("[T]he courts ordinarily presume that the government . . . will comply with the law."). Should the Department of Corrections or anyone else wrongfully disclose protected information, remedies are provided by statute. See 20 V.S.A. § 1941; *supra*, ¶ 6.

¶ 29. The dissent argues that "[i]t is no answer to the invasion of privacy permitted by [this] opinion that the statute provides for both criminal and civil remedies for wrongful disclosure of private information obtained pursuant to the DNA database statute." *Post*, ¶ 67. The concern is that the state and federal governments "have in the past failed to protect individuals' privacy rights when tasked with maintaining large stores of personal information." *Id.* There are several responses to this. First, we are not asked to evaluate the State's *ability* to follow the statute the Legislature enacted. See *City of Marina*, 138 P.3d at 708 (courts ordinarily assume that other branches of government will comply with the law as written). If that were our task, and had it been

the trial court's, the record before us would look very different than it does, and the trial court would presumably have made some findings on the subject. We would not be left to rely on newspaper articles selected based on undisclosed criteria and written largely *after* the record was complete in this appeal. See *post*, ¶ 67 (citing newspaper articles dated January 30, 2007; March 9, 2006; and March 9, 2007). Second, we decide actual cases and controversies, not hypothetical questions. See *supra*, ¶ 25 n.10 and authorities cited therein. Thus, the possibility that the State might accidentally or intentionally disclose genetic information in contravention of the statute simply cannot influence our decision in this case, where no such disclosure is alleged to have happened, or even to be likely to happen. We further note that misuse of information necessary to the functions of government has not traditionally supported either expunging that information whole-sale from government records, judicial invalidation of the statutes authorizing its collection, or imposing the warrant requirement on those collecting the data.

 ¶ 30. The searches the statute authorizes are subject to clear administrative guidelines and are performed uniformly on all felons subject to them. Accordingly, they do not raise the specter of unbridled officer discretion to harass particular individuals, against which Article 11 is a bulwark of protection. See *Welch*, 160 Vt. at 91, 624 A.2d at 1116 (Johnson, J., dissenting) ("In short, this Court has permitted warrantless regulatory searches in circumstances evincing special needs, but only when explicit guidelines ensure that the searches are not a pretext for singling out individuals."); *Record*, 150 Vt. at 86, 548 A.2d at 424 (upholding random roadside sobriety checks because "written police guide-lines prevented arbitrary police conduct, and the scope of the roadblock was narrowly drawn"); cf. *Amerson*, 483 F.3d at 82 ("[W]hat makes the government's need to create a DNA database 'special,' despite its relationship to law enforcement, is (as a matter of first principles) its incompatibility with the normal requirements of a warrant and probable cause . . . .").

 ¶ 31. In light of the statutory limits on the analysis of genetic information, the post-sampling intrusion on protected privacy interests is closely akin to that occasioned by the retention and searching of fingerprint records. As we noted in *R.H.*, "[l]ike fingerprinting, saliva sampling involves no intrusion into a person's

life or thoughts; it [cannot] be used repeatedly to harass; it is not subject to abuses like the improper line-up or the third degree." 171 Vt. at 238, 762 A.2d at 1247. The data retained in the database serve only to prove identity, like a fingerprint. Accord *Goord*, 430 F.3d at 671.

¶ 32. The information in the database, then, is not information defendants can reasonably expect to keep private as convicted felons. Cf. *Sczubelek*, 402 F.3d at 185 ("Individuals on supervised release cannot reasonably expect to keep information bearing on their physical identity from government records. Thus, for criminal offenders the privacy interests implicated by the collection of DNA are minimal."); *Jones*, 962 F.2d at 306 ("[W]hen a suspect is arrested upon probable cause, his identification becomes a matter of legitimate state interest and he can hardly claim privacy in it.").

¶ 33. Further, of the many methods of determining identity, DNA is more accurate and far less susceptible to the various methods of deception employed by wrongdoers:

> It is a well recognized aspect of criminal conduct that the perpetrator will take unusual steps to conceal not only his conduct, but also his identity. Disguises used while committing a crime may be supplemented or replaced by changed names, and even changed physical features. Traditional methods of identification by photographs, historical records, and fingerprints often prove inadequate. The DNA, however, is claimed to be unique to each individual and cannot, within current scientific knowledge, be altered. . . . Even a suspect with altered physical features cannot escape the match that his DNA might make with a sample contained in a DNA bank, or left at the scene of a crime within samples of blood, skin, semen or hair follicles. The governmental justification for this form of identification, therefore, relies on no argument different in kind from that traditionally advanced for taking fingerprints and photographs, but with additional force because of the potentially greater precision of DNA sampling and matching methods.

*Jones*, 962 F.2d at 307. This accuracy, and DNA's concomitant ability to conclusively exonerate the innocent, weigh heavily in favor of the statute.

■ ¶ 34. Defendants argue that nonviolent felons like them may not be subjected to sampling under Article 11 even if sampling of violent felons would be permissible. The Chittenden District Court agreed, holding that "there is a question of 'fit'" between the sampling requirements in the new statute and the crimes these defendants committed, which the court noted would seldom involve DNA evidence. A similar argument was advanced and rejected in *Jones. Id.* at 308. There, several inmates convicted of nonviolent offenses argued, with supporting statistics, that the vast majority of cases involving DNA evidence were murders or rapes, and that there was only a small statistical likelihood that nonviolent offenders would later commit those crimes. See *id.* (noting that 97% of cases where DNA evidence was used were murders or rapes, and that less than 1% of nonviolent offenders are later arrested on murder or rape charges). The Court of Appeals for the Fourth Circuit agreed with the inmates that the state's "interest in DNA testing is significantly more compelling with regard to those felons convicted of violent crimes than those not," but concluded that "[t]he effectiveness of the [state's] plan, in terms of percentage, need not be high where the objective is significant and the privacy intrusion limited." *Id.* (citing *Mich. Dep't of State Police v. Sitz,* 496 U.S. 444, 454-55 (1990) (upholding DUI roadblock despite arrest rate of 1.5%)); *Bell v. Wolfish,* 441 U.S. 520, 559 (1979) (upholding searches of pretrial detainees; only single instance where inmate caught with contraband)). We agree with that analysis, and note also that the statute's purposes go beyond the mere identification of perpetrators and extend to exoneration of the innocent and identification of missing persons, both of which purposes are served regardless of the violence of the underlying offense.

■ ¶ 35. In summary, we conclude that the DNA sampling statute does not offend Article 11 as applied to nonviolent felons, whether they are incarcerated or not. The statute serves special needs beyond normal law enforcement and advances important state interests that outweigh the minimal intrusions upon protected interests.

*The judgment of the Chittenden District Court is reversed, and the judgment of the Addison District Court is affirmed.*

¶ 36. **Johnson, J.,** dissenting. A generation ago, the late Justice William O. Douglas presciently stated: "[T]he privacy and dignity

of our citizens is being whittled away by sometimes imperceptible steps. Taken individually, each step may be of little consequence. But when viewed as a whole, there begins to emerge a society quite unlike any we have seen — a society in which government may intrude into the secret regions of man's life at will." *Osborn v. United States*, 385 U.S. 323, 343 (1966) (Douglas, J., dissenting and concurring). This case, involving as it does the need to maintain constitutional values of privacy while allowing law enforcement to take full advantage of new technologies for solving crimes, starkly raises the concern addressed by Justice Douglas.

¶ 37. The statute under review authorizes the State to extract and to maintain forever a DNA sample from any person convicted of a felony. All defendants in this case have been duly convicted of such crimes and are, therefore, subject to the statute. They have refused to give a sample of their DNA, asserting that the statute violates their privacy rights under Article 11 of the Vermont Constitution. As convicted felons, defendants may evoke little sympathy when they seek to challenge the pains and penalties that stem from their guilt. And it is well-established that conviction for a felony necessarily results in certain diminutions in one's privacy rights. These considerations, however, must not deter us from our duty to fully uphold the constitutional rights of all of the people, for, as Justice Douglas so insightfully observed, if we fall into the habit of tolerating small assaults on our privacy, on the ground that in and of itself each seems inconsequential to society at large, we will eventually reach a condition in which we have little or no privacy at all.

¶ 38. We are asked to decide whether the taking, the perpetual maintenance and the future analysis of DNA samples, involuntarily taken from individuals for the sole reason of their conviction of certain crimes, violates Article 11 of the Vermont Constitution. Conceptually, this is a matter of the law of search and seizure. In my judgment, the majority has given us the wrong answer to the question presented, and its analysis is wholly inadequate for the important task before the Court. Because I believe that our jurisprudence plainly requires a different result, I respectfully dissent.

¶ 39. Before turning to the precise legal question involved, it is important to bear in mind the context in which the DNA database statute was passed. The availability of DNA evidence has enhanced forensic investigations of certain kinds of violent crimes,

and most notably, has served to exonerate people wrongfully convicted through processes that appellate courts have nevertheless adjudged as fair. See P. Monteleoni, *DNA Databases, Universality, and the Fourth Amendment*, 82 N.Y.U. L. Rev. 247, 253 (2007). Although its significance as evidence in other crimes is doubtful,[12] DNA evidence has come to be seen as a panacea for solving crimes, especially past crimes where leads have grown cold. Hence, federal and state statutes have been passed permitting the collection of DNA from convicted felons and, in some cases, even mere arrestees, without requiring any showing of the individualized suspicion ordinarily necessary before the government may constitutionally undertake a search. See T. Simoncelli & S. Krimsky, *A New Era of DNA Collections: At What Cost to Civil Liberties?*, at 4-6 (2007) available at http://www.acslaw.org/node/5338.

¶ 40. The history of DNA database statutes reveals that, while databases were first limited, as they were in Vermont, to violent felons, many databases have been expanded to include all felons, juveniles, some misdemeanants, and even arrestees. Rothstein & Talbott, *supra*, at 153 ("[T]he success of [DNA] databases in solving violent crimes provided the impetus for Congress and state legislatures to expand the scope of the databases with little critical examination of each expansion's value to law enforcement or cost to privacy and civil liberties."). Indeed, the statute before us in this case expanded DNA collection from violent felons to all felons, and a bill has recently been introduced in the Vermont Legislature to extend the reach of the database to arrestees. See H.181, 2007-2008 Gen. Assem., Bien. Sess. (Vt. 2007) (expanding DNA database to certain classes of arrestees). If that bill is enacted, anyone arrested on felony charges, including those persons who may be entirely innocent or whose identity has been mistaken, would be subject to the invasion of privacy now sanctioned against all convicted felons.[13] Whether such an expanded

---

[12] As commentators have noted, there has been virtually no scientific analysis of the overall effectiveness of DNA databases in solving or preventing crimes or comparison of the databases' effectiveness to that of other forensic techniques. M. Rothstein & M. Talbott, *The Expanding Use of DNA in Law Enforcement: What Role for Privacy?*, 34 J.L. Med. & Ethics 153, 154-55 (2006).

[13] At the federal level, the collection and retention of DNA from arrestees and non-U.S. persons detained under federal authority is already sanctioned. 42 U.S.C. § 14135a(a)(1)(A).

database would be constitutional under Article 11 of the Vermont Constitution depends on the same analysis that the majority misapplies today to the statute requiring all felons to provide DNA samples. That is precisely why this case is so important to us all.

¶ 41. The State, and every court to consider the issue, concedes that the taking of a DNA sample involves an initial search, that the subsequent analysis of the individual's DNA material is another search, and that both of these searches are subject to constitutional requirements. To pass constitutional muster, a search must either be supported by probable cause and a warrant or be subject to one of the limited exceptions to the warrant rule. *State v. Bauder*, 2007 VT 16, ¶ 14, 181 Vt. 392, 924 A.2d 38; *State v. Savva*, 159 Vt. 75, 86, 616 A.2d 774, 780 (1991). As we said in *Savva*,

> as a matter of constitutional policy, a warrant require-ment is not a starting point for deriving exceptions that balance citizens' interest in privacy against law enforce-ment's interest in expeditious searches. Rather, it *is* the balance reached by the constitutional drafters . . . .

159 Vt. at 85-86, 616 A.2d at 780. Because the warrant and probable cause requirements set a standard of reasonableness, we have departed from these basic principles only when exigent circumstances were present or when special needs beyond the ordinary needs of law enforcement demanded an exception. See *State v. Berard*, 154 Vt. 306, 310-11, 576 A.2d 118, 120-21 (1990) ("[T]his Court . . . abandon[s] the warrant and probable-cause requirements, which constitute the standard of reasonableness for a government search that the Framers established, only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." (quotation omitted)); see also *State v. Welch*, 160 Vt. 70, 78-79, 624 A.2d 1105, 1110 (1992). In other words, if the government is engaged in the ordinary business of law enforcement, such as crime detection, it must have a warrant to infringe on individual privacy rights.

¶ 42. Thus, the constitutional problem presented by the DNA database statute is how to fit the statute within an exception to

the warrant requirement. In my view, it cannot be done.[14] Some courts have done it by finding the government's interest in obtaining the DNA of persons within the corrections system to be a special need beyond the ordinary detection of crime. See, e.g., *Nicholas v. Goord*, 430 F.3d 652, 668-69 (2d Cir. 2005); *Green v. Berge*, 354 F.3d 675, 677-79 (7th Cir. 2004); *United States v. Kimler*, 335 F.3d 1132, 1146 (10th Cir. 2003). Many courts, including the overwhelming majority of federal circuit courts, have been unable to overlook the "centrality of law enforcement objectives" in these statutes and have analyzed the question using a totality of circumstances test to justify departure from the warrant rule. *United States v. Weikert*, 504 F.3d 1, 8-10 (1st Cir. 2007) (recognizing that majority of federal circuit courts apply a "totality of the circumstances" test to DNA database statutes, including the Third, Fourth, Fifth, Eighth, Ninth, Eleventh and D.C. Circuits). Under that test, and after the United States Supreme Court decision in *Samson v. California*, the privacy rights of prisoners, probationers and conditional releasees are reduced to nil such that there is nothing left to balance against any articulated government interest.[15] 547 U.S. 843 (2006). Under our own jurisprudence, however, there must first be a special need

---

[14] While I recognize that every appellate court to have considered the constitutionality of DNA database statutes thus far has upheld them, the issue is not without controversy in the courts, and the constitutionality of DNA databases is not a foregone conclusion — particularly under our unique Article 11 jurisprudence — as implied by the majority. See, e.g., *United States v. Stewart*, 468 F. Supp. 2d 261 (D. Mass. 2007) (holding that federal DNA Act is unconstitutional as applied to probationer); *United States v. Sczubelek*, 402 F.3d 175, 189 (3d Cir. 2005) (McKee, J., dissenting); *United States v. Kincade*, 379 F.3d 813, 842 (9th Cir. 2004) (Reinhardt, J., dissenting).

[15] The United States Supreme Court's recent Fourth Amendment decision allowing warrantless, suspicionless searches of parolees based solely on a general balancing of interests is inapposite to our own analysis of the DNA database statute's constitutionality under Article 11. In *Samson*, the Court relied on the defendant's status as a person within the corrections system as justification for its departure from the traditional special needs analysis. 547 U.S. at 848-49. As the *Samson* dissent duly recognized, this is circular reasoning: a defendant's status in the corrections system makes him subject to warrantless searches, which undermines his reasonable expectation of privacy, which allows the Court to abandon constitutional protections in favor of a general balancing of interests, which necessarily results in any government interest outweighing the parolees' effectively nonexistent privacy interests. *Id.* at 857-58. Under this regime, the constitutional protections against unreasonable search and seizure cease to apply to citizens within the corrections system, whether prisoners, probationers or parolees.

beyond general crime control to allow courts to engage in balancing individual privacy interests against the government's interest, and second, there must be a nexus between the government's interest and the restriction on privacy rights. See *State v. Lockwood*, 160 Vt. 547, 556, 632 A.2d 655, 661 (1993) (probation conditions allowing for warrantless searches must be "supported by the findings and [be] narrowly tailored to fit the circumstances of the individual probationer" with respect to the probationer's rehabilitation goals and public safety concerns (quotation omitted)). The DNA statute, as applied to the nonviolent felons in this case, does not meet either prong of our test.

¶ 43. I begin with the statute and its purpose, as articulated by the Legislature in its preamble to the original statute:

> It is the policy of this state to assist federal, state and local criminal justice and law enforcement agencies in the identification, detection or exclusion of individuals who are subjects of the investigation or prosecution of violent crimes. Identification, detection and exclusion may be facilitated by the DNA analysis of biological evidence left by the perpetrator of a violent crime and recovered from the crime scene. The DNA analysis of biological evidence can also be used to identify missing persons.

20 V.S.A. § 1931 (effective April 29, 1998). The original purpose remains unchanged, but the law now requires that every person convicted of a designated crime, including nonviolent felonies, whether in the custody of the Department of Corrections, on probation, parole or serving a supervised community sentence, submit a DNA sample. *Id.* § 1933 (Cum. Supp. 2007). Designated crimes include felonies, an attempt to commit a felony, or any other offense resolved by plea agreement, if as part of the plea agreement, the original charge was a designated crime and probable cause was found by the court. *Id.* § 1932(12). Thus, under

---

The Supreme Court's abandonment of the special needs doctrine stands in sharp contrast to our own jurisprudence. We have never held that an individual's status alone can so undermine his right to constitutional protections that any articulated governmental interest may justify a warrantless, suspicionless search of that individual. As such, I believe the "totality of the circumstances" test has no place in our Article 11 jurisprudence and reiterate that only a special need, beyond normal law enforcement needs, can justify warrantless, suspicionless searches such as those sanctioned by the DNA database statute at issue.

the statute it is the felon's status that compels the sample rather than any individualized suspicion that a particular felon has committed a crime in the past or will commit a crime in the future.

¶ 44. The primary purpose of the statute is straightforward — to identify suspects who may have committed crimes or may at some indefinite future point commit crimes. Indeed, this purpose was obvious in the legislative history, during which the Legislature heard from the FBI, local law enforcement, and parents of a violent crime victim, among others. Vermont's statute is based on the federal DNA Act, which authorizes extraction of DNA samples from individuals convicted of a qualifying federal offense for entry into the FBI's Combined DNA Index System (CODIS) — "a massive, centrally managed database including DNA profiles from federal, state, and territorial DNA collection programs, as well as profiles drawn from crime-scene evidence." *Weikert*, 504 F.3d at 3-4. The mission statement of CODIS, which is incorporated by reference in the Vermont DNA database statute, explicitly states that it is an "effective tool for solving violent crimes" and that it was formed in 1990 "for law enforcement purposes." *Id.* at 10 (quotation omitted). The Vermont bill was promoted by its advocates as an important national law enforcement tool, and the Legislature's statement of purpose reflects that goal.[16] Although the State has articulated other legitimate uses of the database under the statute, it cannot reasonably be argued that the primary purpose of collection is other than crime detection. And while the legislative purpose is an obviously valid one, the means to the end must nonetheless pass constitutional muster.

¶ 45. Nothing in our Article 11 jurisprudence overcomes the basic fact that the State cannot articulate a special need to collect DNA samples from all felons. Previously, we have found special needs in two contexts that are relevant here — invasions on the

---

[16] In fact, introduction of the DNA database statute in the Vermont Legislature was largely motivated by the efforts of the federal government to integrate state DNA databases with CODIS. The state forensic lab director at the time the bill was in committee testified that the state stood to gain $172,000 in federal funding to improve its operations, conditioned on Vermont passing its own DNA database law. State DNA Databank: Hearing on H.89 Before House Judiciary Comm., 1997-1998 Bien. Sess. (Vt. Jan. 22, 1997).

privacy rights of prison inmates and of probationers.[17] Our controlling precedent is *State v. Berard*, 154 Vt. 306, 576 A.2d 118 (1990), in which we recognized for the first time that a special need going beyond ordinary law enforcement could support a different constitutional analysis for determining the reasonable-

---

[17] There are other decisions in which we have overlooked the warrant and probable cause requirements of Article 11 that are inapposite to our analysis today. In *State v. Richardson*, we upheld a warrantless search in which a police officer removed a gun in plain view from the defendant's car. 158 Vt. 635, 603 A.2d 378 (1992) (mem.). The immediate threat of the exposed gun if left unattended was a special need justifying a departure from Article 11 protections. *Id.* at 636, 603 A.2d 379. Thus, while the *Richardson* decision is instructive on the "special need" prong of the Article 11 exception, it differs from the instant case because the search was based on individualized suspicion of criminal wrongdoing. Likewise, we departed from the warrant and probable-cause analysis in *State v. Welch*, where we upheld a warrantless inspection of the defendant's pharmaceutical prescriptions under the "pervasively regulated industry" exception. 160 Vt. 70, 80-81, 624 A.2d 1105, 1111 (1992). Although I advocated for a special needs analysis in my dissenting opinion, the majority reached its holding based on the regulatory search exception to the warrant rule. See *id.* at 90-91, 624 A.2d at 1116 (Johnson, J., dissenting). In addition, the search in *Welch* was conducted on the basis of individualized suspicion. Thus, the *Welch* analysis is inapplicable here.

Prior to *Berard*, in *State v. Record*, we upheld DUI roadblocks conducted under strict guidelines, finding that the government's interest in immediately removing intoxicated drivers from the roadway outweighed the minimal intrusion presented by the roadblock. 150 Vt. 84, 548 A.2d 422 (1988). While *Record* is relevant to our current inquiry to the extent that it involved suspicionless, warrantless searches, it predated the governing special needs exception and relied on a simple balancing of interests to overcome Article 11's individualized suspicion and warrant requirements. As the dissent in *Record* noted, there was an important analytical oversight in the majority's analysis of the constitutionality of DUI roadblocks. *Id.* at 97, 548 A.2d at 430 (Hill, J., dissenting). If Article 11's protections could be overcome anytime the governmental interest in a search outweighed individual privacy interests, the rule requiring a warrant and probable cause for constitutional reasonableness would be swallowed up by the exception. Thus, the *Record* dissent posited that the threshold question was "whether a DUI roadblock presents the sort of exceptional circumstances that . . . justify abandonment of the warrant and probable cause requirements," and concluded that it did. *Id.* Only then did the dissent go on to conduct a balancing of the respective interests of the government and the individuals subject to the roadblock. Two years later, we decided *Berard* and adopted the dissent's reasoning in *Record*, holding that the State must show "special needs, beyond the normal need for law enforcement" to overcome Article 11's probable cause and warrant requirements. *Berard*, 154 Vt. at 311, 576 A.2d at 121. The Court acknowledged that it had not previously announced the "special needs" standard, but maintained that "extraordinary factors" necessitated the search in *Record* and retrospectively recognized "[t]he special needs of the state in a DUI roadblock." *Id.* at 311, 314 n.3, 576 A.2d at 121, 122 n.3.

ness of a search undertaken without probable cause or a warrant. See *O'Connor v. Ortega*, 480 U.S. 709, 741 (1987) (Blackmun, J., dissenting) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985)). In *Berard*, a prison inmate was charged with possession of drugs after prison officials conducted a routine, random and suspicionless search of his cell without a warrant. In upholding the search, we adopted a two-part test, in which a balancing test was substituted for the warrant and probable-cause requirement.

¶ 46. To trigger the balancing test, the State first had to demonstrate that its ability to maintain institutional security presented a special need that rendered the warrant and probable-cause requirements impracticable. *Berard*, 154 Vt. at 311-12, 576 A.2d at 121-22. We recognized that the prison environment was unique, and that the State's objective in operating an institution free of contraband of all kinds, including dangerous weapons, was likely to be substantially hindered by the inability to conduct random searches.[18] *Id.* at 312-13, 576 A.2d at 121-22.

¶ 47. Once we determined that a significant special need allowed a balancing test to be substituted for a warrant and probable cause, we proceeded to weigh the State's " 'paramount interest in institutional security' against the inmates' residuum of privacy rights." *Id.* at 313, 576 A.2d at 122. We rejected the State's position that we analyze the constitutional question as if prison inmates had no reasonable expectation of privacy, such that any official conduct was reasonable. *Id.* at 310-12, 576 A.2d at 120-21; cf. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (holding that under Fourth Amendment, prisoners have no reasonable expectation of privacy in their cells). Although privacy rights of prisoners are diminished, we noted they are not nonexistent. *Berard*, 154 Vt. at 313, 314 n.4, 576 A.2d at 122, 123 n.4 ("though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections" (quotation omitted)). Nonetheless, the privacy interest of the defendant in *Berard* was overcome by the State's interest because the searches were undertaken as part of a random policy that served broad objectives, and did not arbitrarily or specifically target him.

---

[18] Even the defendant conceded that random searches were necessary for this purpose, but advocated for a warrant to be issued on something less than probable cause.

¶ 48. We applied a similar line of reasoning in *State v. Lockwood*, 160 Vt. 547, 632 A.2d 655 (1993), in considering a blanket probation condition that permitted warrantless searches of a probationer's home and person. We found the probation condition overbroad in that it did not recognize the probationer's right of privacy, one that was greater than that of the prison inmate in *Berard*, but upheld the search because the officers had "reasonable grounds" to support it prior to the search, and the probation condition restricting the probationer's constitutional rights was individually and narrowly tailored to meet the goals of his rehabilitation and the protection of the public. *Lockwood*, 160 Vt. at 558, 632 A.2d at 662. We stated that "if a probation term provides for warrantless searches and the terms of probation are narrowly tailored to fit the circumstances of the individual probationer, the . . . 'reasonable grounds' standard strikes the proper balance between probationer privacy rights and public protection concerns." *Id.* at 559, 632 A.2d at 663. Therefore, outside the prison walls, the government's burden to overcome even the diminished privacy rights of a probationer demands a nexus between the special need and the warrantless intrusion, and individualized suspicion.

¶ 49. The majority relies on the special-needs doctrine, arguing that the collection of DNA for inclusion in a law enforcement database is not an ordinary law enforcement purpose, and that the protections of Article 11 may therefore be overlooked as impracticable. Although our law is considerably different from federal law and that of other states, the majority reaches this conclusion by accepting the analysis of the Supreme Court of New Jersey in *State v. O'Hagen*, 914 A.2d 267 (N.J. 2007). In *O'Hagen*, the court concluded that the primary purpose of the DNA tests is to create a DNA database to assist in the future resolution of crimes, and because it is a long-range special need that does not have the "immediate" objective of gathering evidence against the offender, the statute does not impermissibly target individuals without reasonable suspicion. 914 A.2d at 278. The majority also accepts the special-needs analysis of the Second Circuit Court of Appeals in *Nicholas v. Goord*, interpreting the New York statute as presenting a more "nuanced approach to law-enforcement concerns." 430 F.3d at 668. The court in *Goord* concluded that DNA samples are simply an information-gathering tool that may eventually help law enforcement identify the perpetrator of a crime,

but because they do not do so immediately at the time of collection, the collection is not sought for the investigation of a specific crime. *Id.* at 667-68.

¶ 50. First, the reasoning on which the majority opinion relies completely overlooks that DNA collection from persons recently convicted may identify — immediately, or as soon as the analysis and database check is completed — a suspect in an old, unsolved crime, and that such person will be prosecuted as a result of the identification. This is ordinary detection of crime for which the majority mounts no special-needs justification.

¶ 51. Second, even if the DNA collected is analyzed and awaits a possible match with a future crime, the time distinction increases the constitutional problem, rather than decreases it. If no current crime needs solving, the government's need to use extraordinary procedures that abandon the warrant and probable-cause requirement is difficult to justify. The State's interest is obviously weaker if it is gathering information for crimes that have not yet been committed. Cf. *Illinois v. Lidster*, 540 U.S. 419 (2004) (upholding roadblock on grounds that stop's objective was to help find the perpetrator of a specific and known crime, not of unknown crimes of a general sort). Contrary to the majority's assertion, cataloguing DNA for future prosecutions, for crimes not yet committed, is precisely the kind of evil sought to be remedied by Article 11 — the intrusion on the privacy of individuals for whom no reasonable suspicion of wrongdoing can be articulated.[19] Collecting DNA for crimes that may never be committed, to further some sort of general deterrence goal, undeniably serves a general law enforcement purpose.[20]

¶ 52. Third, the fact that DNA statutes merely allow the collection of data for identity purposes begs the special-needs question. See *Goord*, 430 F.3d at 669 (defining governmental interest in DNA database as "obtaining identifying information from convicted offenders and keeping a record of such informa-

---

[19] To be sure, the evil resulting from unlimited discretion accorded to officers who held general warrants was an additional factor in the adoption of Article 11, but it is not one that overcomes the principal purpose of Article 11: to protect the right of the people to privacy against government interference.

[20] The articulation of "other purposes," such as the identity of missing persons, or the exoneration of the innocent, are not sufficiently dominant or supported to provide the special needs necessary to meet the State's burden and serve only as makeweight in the majority opinion.

tion"). The question is whether the identifying information is sought for ordinary law enforcement purposes.[21] Our constitution makes no distinction between evidence gathered for identification of suspects and other kinds of evidence. If the police decided to conduct a dragnet by demanding the DNA of every white male in a certain neighborhood in an attempt to "merely identify" the perpetrator of a violent crime, that action could not be carried out constitutionally as a special need.

¶ 53. In short, the DNA statute allows the State to collect DNA from individuals for the express purpose of identifying them as either the perpetrator of a past crime, or the perpetrator of a future crime, so that they may be prosecuted. As many courts and commentators have now recognized, calling the collection of DNA under the database statutes a special need of law enforcement is like trying to fit a square peg into a round hole. See, e.g., *Weikert*, 504 F.3d at 9-10; J. Rikelman, *Justifying Forcible DNA Testing Schemes Under the Special Needs Exception to the Fourth Amendment: A Dangerous Precedent*, 59 Baylor L. Rev. 41, 65-68 (2007); Monteleoni, *supra*, at 262-67.

¶ 54. The majority's analysis plainly fails to meet the first requirement of our own precedent in *Berard* — to demonstrate that a credible special need exists to abandon the warrant and

---

[21] Although we adopted the special-needs doctrine from federal case law, our Article 11 special-needs jurisprudence has since developed differently from the federal Fourth Amendment test, particularly with respect to prisoners, probationers and others within the corrections system. Nevertheless, recent United States Supreme Court decisions rejecting or upholding the application of special needs, while not controlling, are instructive on the question of what is a special need. The term most certainly does not embrace either society's general interest in crime control or the targeting of individuals for prosecution. Compare *City of Indianapolis v. Edmond*, 531 U.S. 32, 41-47 (2000) (invalidating a roadside checkpoint designed to detect illegal drugs), and *Ferguson v. City of Charleston*, 532 U.S. 67, 77-84, 83 n.20 (2001) (holding unconstitutional a public hospital's forwarding results of nonconsensual drug testing of maternity patients to police — "[i]n none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes"), with *Lidster*, 540 U.S. at 427 (upholding checkpoint, but individuals not targeted for prosecution), *Bd. of Educ. v. Earls*, 536 U.S. 822, 829 (2002) (upholding random drug testing of students, but no prosecution allowed), and *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 663, 677 (1989) (upholding drug testing of urine of customs officials for positions requiring use of firearms or involving interdiction of illegal drugs, but official who tested positive could be dismissed but not prosecuted criminally).

probable-cause requirement. Its analysis is inadequate to the important task before the Court.

¶ 55. Even if I were to accept that the collection of DNA is a special need, however, the majority has not shown that there is a nexus between the State's special need and the warrantless intrusion on appellants' rights, or that the intrusion is narrowly tailored to accomplish those ends. See *Lockwood*, 160 Vt. at 556, 632 A.2d at 661. Thus, its conclusion that the State's interest in the DNA database statute outweighs the important privacy interests that nonviolent felons maintain in their DNA is entirely unsupported.

¶ 56. The State has the burden to demonstrate a nexus between the collection and profiling of DNA samples from all convicted, nonviolent felons and its interest in identifying perpetrators of future crimes, deterring criminal activity, and preventing recidivism. As we have held, the State's interest in both rehabilitating those in the corrections system and protecting the public from convicted criminals is reasonably furthered by activities such as random prison-cell searches and searches of probationers' homes based on reasonable suspicion, and thus, there is a sufficient nexus to depart from the warrant and probable-cause requirements. Here, there is no similar connection between the State's interest in penalizing, controlling, or rehabilitating convicted felons and collecting, profiling, and repeatedly searching their unique genetic material, nor does the State even attempt to argue that there is.

¶ 57. The State's general interest in preventing crime is no more furthered by collecting the DNA of all convicted felons than it would be by sampling the DNA of all Vermont citizens. As the District Court, Judge Levitt presiding, saliently concluded in its ruling on the constitutionality of the DNA database statute:

> [T]here is a question of "fit." Identity is never at issue in the type of crimes in which the above-named defendants were convicted, that is false pretenses, drug possession, or driving while intoxicated. It is crimes against persons where DNA identification and exclusion is most relevant, not the non-contact crimes involving possession, intoxication or larceny.

To reach the majority's conclusion, one therefore has to accept the proposition that, although identity is generally not at issue in

nonviolent felonies, the fact that the State holds the DNA of a nonviolent felon will deter that person from committing crimes in the future. Not even the majority finds that a viable proposition. See *ante*, ¶ 20.

¶ 58. Given the weak nexus between the State's means and its ends, the majority has not shown that the State's interest in solving or deterring future crimes outweighs defendants' privacy interests in their DNA. See *Berard*, 154 Vt. at 311, 576 A.2d at 121; *Lockwood*, 160 Vt. at 556-59, 632 A.2d at 661-63. Even the warrantless search in *Lockwood*, which intruded only on possessory interests, was supported by "reasonable grounds" in light of the residuum of privacy accorded to a probationer. 160 Vt. at 558-59, 632 A.2d at 662-63. Unlike *Lockwood*, the majority here gives short shrift to the significant privacy interests involved.

¶ 59. Each of us has a reasonable expectation of privacy in our unique genetic make-up. If we did not, there would be no constitutional question before us. While a convicted felon's privacy interest in his home, or possessory interest in his belongings, may be temporarily diminished given the constraints and goals of the corrections system, he cannot be said to have a similarly lessened expectation of privacy in his unique genetic profile. DNA analysis has the potential to reveal a panoply of private genetic information, including physical and medical characteristics, genealogy, and predisposition to disease — none of which bears any relation to the penal, rehabilitative or administrative goals of the corrections system.

¶ 60. To be sure, the privacy rights of convicted felons within the corrections system, whether prisoners, probationers or parolees, are necessarily diminished.[22] As the majority points out, those currently within the corrections system cannot be said to have a reasonable expectation of privacy in their physical identity. Indeed, convicted criminals make their identity a public concern by

---

[22] The majority, while acknowledging the diminished privacy interests of those within the corrections system, fails to analyze the spectrum of privacy rights retained by prisoners, probationers, parolees, and others within the system, respectively. By its reasoning, parolees who have already served their time and are released into free society have no greater privacy interests than prisoners confined to a cell. This is in contravention of our jurisprudence. See *Lockwood*, 160 Vt. at 559, 632 A.2d at 663 (stating that "privacy rights of probationers are arguably greater than those of inmates"); see also *Weikert*, 504 F.3d at 12 (acknowledging that "different statuses may diminish an individual's expectation of privacy to different degrees").

committing a crime, and the government must have identifying information to administer the criminal justice system. This lack of privacy in the mere fact of one's identity, however, does not reasonably extend to the extraction, analysis, indefinite storage and repeated law enforcement searches of convicted felons' DNA without seriously undercutting the constitutional right of citizens to be free in their persons.

¶ 61. The majority attempts, as have other courts, to liken DNA profiling to fingerprinting, and thereby deemphasize the important privacy interests implicated by the DNA database statute. There are, however, critical differences between the two that we must bear in mind in our analysis of the database statute. To begin, fingerprints are regularly exposed to the outside world and cannot be manipulated to reveal private information beyond identity. Within the corrections system, fingerprinting is undertaken as part of the routine booking procedure to establish the identity of the person taken into custody, ascertain the person's criminal history and outstanding warrants, if any, and aid in the apprehension of escaped prisoners. *United States v. Olivares-Rangel*, 458 F.3d 1104, 1113 (10th Cir. 2006).

¶ 62. DNA samples serve a different purpose. They must be analyzed to create a unique profile useful to law enforcement in identifying criminal suspects, and in the process of that analysis, the intimate details of one's genetic make-up are revealed, exposing felons to the type of governmental abuse of privacy that Article 11 is intended to thwart. The majority claims that the statute simply authorizes "the creation, storage, and searching of a unique alphanumeric identifier based on analysis of thirteen locations on DNA that are not associated with any known physical trait." *Ante*, ¶ 26. As scientific advancements in the field of genetics continue, however, the likelihood that increasingly private information can be gleaned from the seemingly innocuous DNA profiles expands. In fact, while the thirteen loci at which DNA samples are measured were once widely believed to be "junk DNA," scientists have in recent years discovered that DNA profiling "can reveal probabilistic information about one's ethnicity and gender." Monteleoni, *supra*, at 256. Furthermore, there is strong scientific evidence to suggest that the profiles may carry information about individuals' genetic predisposition to certain

diseases.[23] See *id.*; D. Concar, *What's in a Fingerprint?*, New Scientist, May 5, 2001, at 9. Thus, DNA profiling involves a significantly greater intrusion of privacy than fingerprinting and other methods of criminal detection and identification.

¶ 63. Even if I agreed that DNA profiling, like fingerprinting, provides no more information than a unique identifier, the critical difference is in the way the identifying information is used. No one here is contending that the State collects DNA samples solely for administrative purposes, such as those underlying the routine fingerprinting by corrections. Rather, the explicit purpose of collecting DNA samples from felons — potentially long after their identity has been established by fingerprinting — is to use them indefinitely to investigate past or as-yet-uncommitted future crimes.

¶ 64. Finally, the majority's reliance on *In re R.H.* for the proposition that DNA sampling, by saliva swab, involves no intrusion greater than that engendered by fingerprinting is misplaced. 171 Vt. 227, 238, 762 A.2d 1239, 1247 (2000). In that case, the view that a cheek swab was a minimal intrusion of privacy was appropriate in light of the safeguards present — reasonable suspicion of the defendant's involvement in a crime and judicial review leading to a nontestimonial order (NTO). Furthermore, we recognized in *R.H.* that protections such as destruction of nonmatching profiles analyzed pursuant to an NTO might be prudent, and requested that the Advisory Committee on the Rules of Criminal Procedure consider adding such safeguards. *Id.* at 238-39, 762 A.2d at 1247-48. While the Advisory Committee determined that such protections were more appropriate for legislative action and the Legislature has as yet failed to act on the matter, the privacy issues implicated were, in the very least, brought to the forefront. See Reporter's Notes, 2006 Amendment, V.R.Cr.P. 41.1. Today, the majority fails entirely to consider the implications of indefinitely storing DNA profiles which, unlike profiles analyzed pursuant to an NTO, are extracted without

---

[23] The majority takes us to task for our reliance on articles outside of the record for the proposition that so-called "junk DNA" can reveal private medical information, when the real problem with this case is that there is nothing approaching a record on this issue and yet the majority decides the question as if there were. It is the majority's reliance on the State's mere assertion that no weighty privacy interest is involved in profiling "junk DNA" that compels the response that there are contrary views on the issue.

individualized suspicion or judicial oversight and based only on the status of the individuals providing the samples.

¶ 65. In comparison to the significant privacy rights at risk in DNA profiling and data-banking, the State's general interest in adding to its arsenal of investigative tools is weak at best. To the extent that the DNA database is intended to solve future crimes that have not yet been committed, the State has little interest in invading the privacy rights of nonviolent felons. To the extent that it is used to solve past crimes, there is already a constitutional mechanism in place for obtaining DNA samples from suspects on the basis of some individualized suspicion and judicial review. See *R.H.*, 171 Vt. at 238-39, 762 A.2d at 1247-48. Nor is the statute narrowly tailored to meet its goals, as any future crimes likely to be committed by recidivist nonviolent offenders are unlikely to be solved by DNA evidence.

¶ 66. In any event, there are no exigencies involved in the use of DNA profiling to investigate past or future crimes. In the case of searches of prison cells or probationers' homes, contraband or other evidence of criminality could be concealed or destroyed in the time it takes to obtain a warrant. DNA, on the other hand, can neither be destroyed nor concealed. The privacy interests of convicted felons in their unique genetic code far outweigh the governmental interest in collecting, storing and searching the DNA of an entire class of individuals for the investigation of as-yet-uncommitted crimes. Thus, the State's inability to demonstrate that its interests in creating and maintaining the investigative tool should overcome the important privacy interests at stake, and its wholesale failure to prove a sufficient nexus between its goals and its methods — sampling of all nonviolent felons — further militate against abandoning Article 11 protections.

¶ 67. It is no answer to the invasion of privacy permitted by the majority's opinion that the statute provides both criminal and civil remedies for wrongful disclosure of private information obtained pursuant to the DNA database statute. See 20 V.S.A. § 1941. The delicate nature of the genetic information at stake here and its availability not only to state but federal law enforcement officials dictates against after-the-fact remedies and in favor of pre-search constitutional safeguards. Unfortunately, our nation's history provides stringent warnings against unabashedly entrusting government with sensitive information about our citizenry. Whether intentionally or accidentally, both our state and federal govern-

ments have in the past failed to protect individuals' privacy rights when tasked with maintaining large stores of personal information. Only recently, state officials announced a major breach of the Vermont Offices of Child Support computer system, providing hackers with access to the names, social security numbers and bank account information of nearly 70,000 state residents. D. Gram, *State Was Warned of Potential Computer Security Breach*, Assoc. Press, January 30, 2007. In response, a computer security expert noted the state's carelessness in storing the data on a computer with such limited security protection. *Id.* Regardless of the state's diligence in maintaining the state DNA database, the fact remains that the statute at issue allows for the dissemination of profiles for storage and use in the federal CODIS. The federal government's track record where protection of sensitive information is concerned is even less reassuring than the state's. Not only have its security measures been compromised on numerous occasions, there is ample evidence of its affirmative misuse of private data for political purposes. For example, as recently as March 2006, the Justice Department reported that the FBI had found hundreds of violations of its own wiretapping and other intelligence-gathering procedures. E. Lichtblau, *Justice Dept. Report Cites Intelligence-Rule Violations by F.B.I.*, N.Y. Times, March 9, 2006, at A21. More disturbingly, only a year later, the Justice Department's inspector general issued a scathing report criticizing the FBI's unauthorized use of administrative subpoenas to obtain thousands of telephone, business and financial records of American citizens under the guise of national security. D. Johnston & E. Lipton, *U.S. Report to Fault Wide Use of Special Subpoenas by F.B.I.*, N.Y. Times, March 9, 2007, at A1. Given this history, I am not persuaded that we should rely on statutory penalties as a meaningful substitute for constitutional safeguards.

¶ 68. The majority scoffs at the notion that DNA database statutes presage futuristic societies like that portrayed in the movie Gattaca (Columbia Pictures Corp. 1997), in which the government maintains a DNA database of all citizens and classifies them as "valid" or "invalid," takes cheek swabs at roadblocks for instantaneous identity verification, and privileges those citizens whose DNA has the qualities it considers desirable. But I would not take this threat to our liberties so cavalierly. Compulsory DNA testing has steadily expanded in scope. Proposals for further expansions are under active consideration, including expansions

that target entirely innocent citizens. More ominously, there is *nothing* in the logic of the majority opinion that will prevent the state from requiring DNA testing of every single one of us. After today, one may ask, what is now the constitutional objection to testing every child at birth in an effort to aid in the identification or recovery of missing children? Every applicant for a state or federal job, or for a job with a government contractor? Every person arrested, whether guilty of some infraction or entirely innocent of wrongdoing? As the majority now defines special need, one can easily think of legitimate reasons for testing virtually everyone; and what we have heretofore required as a valid connection between the special need and the privacy invasion involved in a warrantless search may now apparently be satisfied by the flimsiest of justifications, if any is needed at all.

¶ 69. It is too easy to dismiss a challenge to privacy presented by convicted felons as one that deserves only cursory consideration. The narrow context of the inquiry tends to mask the larger threat to liberty. But even if we are justified in holding a lessened concern for these individuals, they threaten soon to become everyman. We will then have only ourselves to blame for falling within the injunction voiced by one of the most revered of the nation's founders: "They that can give up essential liberty to obtain a little safety deserve neither liberty nor safety." Benjamin Franklin, Historical Review of Pennsylvania (1759).

¶ 70. I am authorized to state that Judge Devine joins this dissent.